FEDERAL MARITIME COMMISSION $v.$ SOUTH
CAROLINA STATE PORTS AUTHORITY ET AL.

No. 01-46.   Argued February 25, 2002—Decided May 28, 2002

*Phillip Christopher Hughey* argued the cause for petitioner. With him on the briefs were *David R. Miles, Amy Wright Larson,* and *Carol J. Neustadt.*

*Deputy Solicitor General Clement* argued the cause for the United States, respondent under this Court's Rule 12.6, urging reversal. On the briefs were *Solicitor General Olson, Assistant Attorney General McCallum, Deputy Solicitor General Wallace, Malcolm L. Stewart, Mark B. Stern,* and *Alisa B. Klein. Warren L. Dean, Jr.,* argued the cause for respondent South Carolina State Ports Authority. With him on the brief were *David Seidman, Jordan B. Cherrick, Elizabeth Herlong Campbell,* and *Susan Taylor Wall.**

---

*Briefs of *amici curiae* urging reversal were filed for the American Federation of Labor and Congress of Industrial Organizations by *Jonathan P. Hiatt, Laurence Gold,* and *David L. Shapiro;* for the National Association of Waterfront Employers by *Charles T. Carroll, Jr.,* and *Carl Larsen Taylor;* for the United States Maritime Alliance Limited et al. by *C. Peter Lambos* and *Donato Caruso;* and for Senator Edward M. Kennedy et al. by *Lloyd N. Cutler, A. Stephen Hut, Jr.,* and *Christopher J. Meade.*

Briefs of *amici curiae* urging affirmance were filed for the State of Maryland et al. by *J. Joseph Curran, Jr.,* Attorney General of Maryland, and *Andrew H. Baida,* Solicitor General, and by the Attorneys General for their respective jurisdictions as follows: *Bill Pryor* of Alabama, *Bruce M. Botelho* of Alaska, *Bill Lockyer* of California, *Ken Salazar* of Colorado, *Richard Blumenthal* of Connecticut, *M. Jane Brady* of Delaware, *Robert A. Butterworth* of Florida, *Robert H. Kono* of Guam, *Thurbert E. Baker* of Georgia, *Earl I. Anzai* of Hawaii, *James E. Ryan* of Illinois, *Steve Carter* of Indiana, *Thomas J. Miller* of Iowa, *Carla J. Stovall* of Kansas, *Richard P. Ieyoub* of Louisiana, *G. Steven Rowe* of Maine, *Mike Moore* of Mississippi, *Jeremiah W. (Jay) Nixon* of Missouri, *Don Stenberg* of Nebraska, *Frankie Sue Del Papa* of Nevada, *John J. Farmer, Jr.,* of New Jersey, *Roy*

JUSTICE THOMAS delivered the opinion of the Court.

This case presents the question whether state sovereign immunity precludes petitioner Federal Maritime Commission (FMC or Commission) from adjudicating a private party's complaint that a state-run port has violated the Shipping Act of 1984, 46 U. S. C. App. § 1701 *et seq.* (1994 ed. and Supp. V). We hold that state sovereign immunity bars such an adjudicative proceeding.

## I

On five occasions, South Carolina Maritime Services, Inc. (Maritime Services), asked respondent South Carolina State Ports Authority (SCSPA) for permission to berth a cruise ship, the M/V *Tropic Sea,* at the SCSPA's port facilities in Charleston, South Carolina. Maritime Services intended to offer cruises on the M/V *Tropic Sea* originating from the Port of Charleston. Some of these cruises would stop in the Bahamas while others would merely travel in international waters before returning to Charleston with no intervening ports of call. On all of these trips, passengers would be permitted to participate in gambling activities while on board.

The SCSPA repeatedly denied Maritime Services' requests, contending that it had an established policy of denying berths in the Port of Charleston to vessels whose primary purpose was gambling. As a result, Maritime Serv-

*Cooper* of North Carolina, *Wayne Stenehjem* of North Dakota, *Betty D. Montgomery* of Ohio, *W. A. Drew Edmondson* of Oklahoma, *Hardy Myers* of Oregon, *D. Michael Fisher* of Pennsylvania, *Sheldon Whitehouse* of Rhode Island, *Charles M. Condon* of South Carolina, *Mark Barnett* of South Dakota, *Paul G. Summers* of Tennessee, *John Cornyn* of Texas, *Mark L. Shurtleff* of Utah, *William H. Sorrell* of Vermont, *Randolph A. Beales* of Virginia, *Christine O. Gregoire* of Washington, *Darrell V. McGraw* of West Virginia, and *Hoke MacMillan* of Wyoming; for the Charleston Naval Complex Redevelopment Authority by *C. Jonathan Benner;* and for the National Governors Association et al. by *Richard Ruda* and *James I. Crowley.*

ices filed a complaint with the FMC,[1] contending that the SCSPA's refusal to provide berthing space to the M/V *Tropic Sea* violated the Shipping Act. Maritime Services alleged in its complaint that the SCSPA had implemented its anti-gambling policy in a discriminatory fashion by providing berthing space in Charleston to two Carnival Cruise Lines vessels even though Carnival offered gambling activities on these ships. Maritime Services therefore complained that the SCSPA had unduly and unreasonably preferred Carnival over Maritime Services in violation of 46 U. S. C. App. § 1709(d)(4) (1994 ed., Supp. V),[2] and unreasonably refused to deal or negotiate with Maritime Services in violation of § 1709(b)(10).[3] App. 14–15. It further alleged that the SCSPA's unlawful actions had inflicted upon Maritime Services a "loss of profits, loss of earnings, loss of sales, and loss of business opportunities." *Id.,* at 15.

To remedy its injuries, Maritime Services prayed that the FMC: (1) seek a temporary restraining order and preliminary injunction in the United States District Court for the District of South Carolina "enjoining [the SCSPA] from utilizing its discriminatory practice to refuse to provide berthing space and passenger services to Maritime Services;"[4]

---

[1] See 46 U. S. C. App. § 1710(a) (1994 ed.) ("Any person may file with the Commission a sworn complaint alleging a violation of this chapter . . . and may seek reparation for any injury caused to the complainant by that violation").

[2] Section 1709(d)(4) provides that "[n]o marine terminal operator may give any undue or unreasonable preference or advantage or impose any undue or unreasonable prejudice or disadvantage with respect to any person."

[3] Section 1709(b)(10) prohibits a common carrier from "unreasonably refus[ing] to deal or negotiate."

[4] See § 1710(h)(1) (1994 ed.) ("In connection with any investigation conducted under this section, the Commission may bring suit in a district court of the United States to enjoin conduct in violation of this chapter. Upon a showing that standards for granting injunctive relief by courts of equity are met and after notice to the defendant, the court may grant a temporary restraining order or preliminary injunction for a period not to

(2) direct the SCSPA to pay reparations to Maritime Services as well as interest and reasonable attorneys' fees;[5] (3) issue an order commanding, among other things, the SCSPA to cease and desist from violating the Shipping Act; and (4) award Maritime Services "such other and further relief as is just and proper." *Id.*, at 16.

Consistent with the FMC's Rules of Practice and Procedure, Maritime Services' complaint was referred to an Administrative Law Judge (ALJ). See 46 CFR § 502.223 (2001). The SCSPA then filed an answer, maintaining, *inter alia*, that it had adhered to its antigambling policy in a nondiscriminatory manner. It also filed a motion to dismiss, asserting, as relevant, that the SCSPA, as an arm of the State of South Carolina, was "entitled to Eleventh Amendment immunity" from Maritime Services' suit. App. 41. The SCSPA argued that "the Constitution prohibits Congress from passing a statute authorizing Maritime Services to file [this] Complaint before the Commission and, thereby, sue the State of South Carolina for damages and injunctive relief." *Id.*, at 44.

The ALJ agreed, concluding that recent decisions of this Court "interpreting the 11th Amendment and State sovereign immunity from *private* suits . . . require[d] that [Maritime Services'] complaint be dismissed." App. to Pet. for Cert. 49a (emphasis in original). Relying on *Seminole Tribe of Fla.* v. *Florida*, 517 U. S. 44 (1996), in which we held that Congress, pursuant to its Article I powers, cannot abrogate

---

exceed 10 days after the Commission has issued an order disposing of the issues under investigation. Any such suit shall be brought in a district in which the defendant resides or transacts business").

[5] See § 1710(g) (1994 ed., Supp. V) ("For any complaint filed within 3 years after the cause of action accrued, the Commission shall, upon petition of the complainant and after notice and hearing, direct payment of reparations to the complainant for actual injury (which, for purposes of this subsection, also includes the loss of interest at commercial rates compounded from the date of injury) caused by a violation of this chapter plus reasonable attorney's fees").

state sovereign immunity, the ALJ reasoned that "[i]f federal courts that are established under Article III of the Constitution must respect States' 11th Amendment immunity and Congress is powerless to override the States' immunity under Article I of the Constitution, it is irrational to argue that an agency like the Commission, created under an Article I statute, is free to disregard the 11th Amendment or its related doctrine of State immunity from *private* suits." App. to Pet. for Cert. 59a (emphasis in original). The ALJ noted, however, that his decision did not deprive the FMC of its "authority to look into [Maritime Services'] allegations of Shipping Act violations and enforce the Shipping Act." *Id.*, at 60a. For example, the FMC could institute its own formal investigatory proceeding, see 46 CFR §502.282 (2001), or refer Maritime Services' allegations to its Bureau of Enforcement, App. to Pet. for Cert. 60a–61a.

While Maritime Services did not appeal the ALJ's dismissal of its complaint, the FMC on its own motion decided to review the ALJ's ruling to consider whether state sovereign immunity from private suits extends to proceedings before the Commission. *Id.*, at 29a–30a. It concluded that "[t]he doctrine of state sovereign immunity . . . is meant to cover proceedings before judicial tribunals, whether Federal or state, not executive branch administrative agencies like the Commission." *Id.*, at 33a. As a result, the FMC held that sovereign immunity did not bar the Commission from adjudicating private complaints against state-run ports and reversed the ALJ's decision dismissing Maritime Services' complaint. *Id.*, at 35a.

The SCSPA filed a petition for review, and the United States Court of Appeals for the Fourth Circuit reversed. Observing that "any proceeding where a federal officer adjudicates disputes between private parties and unconsenting states would not have passed muster at the time of the Constitution's passage nor after the ratification of the Eleventh Amendment," the Court of Appeals reasoned that "[s]uch an

adjudication is equally as invalid today, whether the forum be a state court, a federal court, or a federal administrative agency." 243 F. 3d 165, 173 (2001). Reviewing the "precise nature" of the procedures employed by the FMC for resolving private complaints, the Court of Appeals concluded that the proceeding "walks, talks, and squawks very much like a lawsuit" and that "[i]ts placement within the Executive Branch cannot blind us to the fact that the proceeding is truly an adjudication." *Id.*, at 174. The Court of Appeals therefore held that because the SCSPA is an arm of the State of South Carolina,[6] sovereign immunity precluded the FMC from adjudicating Maritime Services' complaint, and remanded the case with instructions that it be dismissed. *Id.*, at 179.

We granted the FMC's petition for certiorari, 534 U. S. 971 (2001), and now affirm.

## II

Dual sovereignty is a defining feature of our Nation's constitutional blueprint. See *Gregory* v. *Ashcroft*, 501 U. S. 452, 457 (1991). States, upon ratification of the Constitution, did not consent to become mere appendages of the Federal Government. Rather, they entered the Union "with their sovereignty intact." *Blatchford* v. *Native Village of Noatak*, 501 U. S. 775, 779 (1991). An integral component of that "residuary and inviolable sovereignty," The Federalist No. 39, p. 245 (C. Rossiter ed. 1961) (J. Madison), retained by

---

[6] The SCSPA was created by the State of South Carolina "as an instrumentality of the State," for, among other purposes, "develop[ing] and improv[ing] the harbors or seaports of Charleston, Georgetown and Port Royal for the handling of water-borne commerce from and to any part of [South Carolina] and other states and foreign countries." S. C. Code Ann. § 54–3–130 (1992). The United States Court of Appeals for the Fourth Circuit has ruled that the SCSPA is protected by South Carolina's sovereign immunity because it is an arm of the State, see, *e. g., Ristow* v. *South Carolina Ports Authority*, 58 F. 3d 1051 (1995), and no party to this case contests that determination.

the States is their immunity from private suits. Reflecting the widespread understanding at the time the Constitution was drafted, Alexander Hamilton explained:

> "It is inherent in the nature of sovereignty not to be amenable to the suit of an individual *without its consent.* This is the general sense and the general practice of mankind; and the exemption, as one of the attributes of sovereignty, is now enjoyed by the government of every State of the Union. Unless, therefore, there is a surrender of this immunity in the plan of the convention, it will remain with the States . . . ." *Id.,* No. 81, at 487–488 (emphasis in original).

States, in ratifying the Constitution, did surrender a portion of their inherent immunity by consenting to suits brought by sister States or by the Federal Government. See *Alden* v. *Maine,* 527 U. S. 706, 755 (1999). Nevertheless, the Convention did not disturb States' immunity from private suits, thus firmly enshrining this principle in our constitutional framework. "The leading advocates of the Constitution assured the people in no uncertain terms that the Constitution would not strip the States of sovereign immunity." *Id.,* at 716.

The States' sovereign immunity, however, fell into peril in the early days of our Nation's history when this Court held in *Chisholm* v. *Georgia,* 2 Dall. 419 (1793), that Article III authorized citizens of one State to sue another State in federal court. The "decision 'fell upon the country with a profound shock.'" *Alden, supra,* at 720 (quoting 1 C. Warren, The Supreme Court in United States History 96 (rev. ed. 1926)). In order to overturn *Chisholm,* Congress quickly passed the Eleventh Amendment and the States ratified it speedily. The Amendment clarified that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State,

or by Citizens or Subjects of any Foreign State." We have since acknowledged that the *Chisholm* decision was erroneous. See, *e. g.,* *Alden,* 527 U. S., at 721–722.

Instead of explicitly memorializing the full breadth of the sovereign immunity retained by the States when the Constitution was ratified, Congress chose in the text of the Eleventh Amendment only to "address the specific provisions of the Constitution that had raised concerns during the ratification debates and formed the basis of the *Chisholm* decision." *Id.,* at 723. As a result, the Eleventh Amendment does not define the scope of the States' sovereign immunity; it is but one particular exemplification of that immunity. Cf. *Blatchford, supra,* at 779 ("[W]e have understood the Eleventh Amendment to stand not so much for what it says, but for the presupposition of our constitutional structure which it confirms").

### III

We now consider whether the sovereign immunity enjoyed by States as part of our constitutional framework applies to adjudications conducted by the FMC. Petitioner FMC and respondent United States[7] initially maintain that the Court of Appeals erred because sovereign immunity only shields States from exercises of "judicial power" and FMC adjudications are not judicial proceedings. As support for their position, they point to the text of the Eleventh Amendment and contend that "[t]he Amendment's reference to 'judicial Power' and to 'any suit in law or equity' clearly mark it as an immunity from judicial process." Brief for United States 15.

---

[7] While the United States is a party to this case and agrees with the FMC that state sovereign immunity does not preclude the Commission from adjudicating Maritime Services' complaint against the SCSPA, it is nonetheless a respondent because it did not seek review of the Court of Appeals' decision below. See this Court's Rule 12.6. The United States instead opposed the FMC's petition for certiorari. See Brief for United States in Opposition.

For purposes of this case, we will assume, *arguendo*, that in adjudicating complaints filed by private parties under the Shipping Act, the FMC does not exercise the judicial power of the United States. Such an assumption, however, does not end our inquiry as this Court has repeatedly held that the sovereign immunity enjoyed by the States extends beyond the literal text of the Eleventh Amendment.[8] See, *e. g., Alden, supra* (holding that sovereign immunity shields States from private suits in state courts pursuant to federal causes of action); *Blatchford* v. *Native Village of Noatak*, 501 U. S. 775 (1991) (applying state sovereign immunity to suits by Indian tribes); *Principality of Monaco* v. *Mississippi*, 292 U. S. 313 (1934) (applying state sovereign immunity to suits by foreign nations); *Ex parte New York*, 256 U. S. 490 (1921) (applying state sovereign immunity to admiralty proceedings); *Smith* v. *Reeves*, 178 U. S. 436 (1900) (applying state sovereign immunity to suits by federal corporations); *Hans* v. *Louisiana*, 134 U. S. 1 (1890) (applying state sovereign immunity to suits by a State's own citizens under federal-question jurisdiction). Adhering to that well-reasoned precedent, see Part II, *supra*, we must determine whether the sovereign immunity embedded in our constitutional structure and retained by the States when they joined the Union extends to FMC adjudicative proceedings.

## A

"[L]ook[ing] first to evidence of the original understanding of the Constitution," *Alden*, 527 U. S., at 741, as well as

---

[8] To the extent that JUSTICE BREYER, looking to the text of the Eleventh Amendment, suggests that sovereign immunity only shields States from "the '[j]udicial power of the United States,'" *post*, at 777 (dissenting opinion), he "engage[s] in the type of ahistorical literalism we have rejected in interpreting the scope of the States' sovereign immunity since the discredited decision in *Chisholm*," *Alden* v. *Maine*, 527 U. S. 706, 730 (1999). Furthermore, it is ironic that JUSTICE BREYER adopts such a textual approach in defending the conduct of an independent agency that itself lacks any textual basis in the Constitution.

early congressional practice, see *id.,* at 743–744, we find a relatively barren historical record, from which the parties draw radically different conclusions. Petitioner FMC, for instance, argues that state sovereign immunity should not extend to administrative adjudications because "[t]here is no evidence that state immunity from the adjudication of complaints by *executive officers* was an established principle at the time of the adoption of the Constitution." Brief for Petitioner 28 (emphasis in original). The SCSPA, on the other hand, asserts that it is more relevant that "Congress did not attempt to subject the States to private suits before federal administrative tribunals" during the early days of our Republic. Brief for Respondent SCSPA 19.

In truth, the relevant history does not provide direct guidance for our inquiry. The Framers, who envisioned a limited Federal Government, could not have anticipated the vast growth of the administrative state. See *Alden, supra,* at 807 (SOUTER, J., dissenting) ("The proliferation of Government, State and Federal, would amaze the Framers, and the administrative state with its reams of regulations would leave them rubbing their eyes"). Because formalized administrative adjudications were all but unheard of in the late 18th century and early 19th century, the dearth of specific evidence indicating whether the Framers believed that the States' sovereign immunity would apply in such proceedings is unsurprising.

This Court, however, has applied a presumption—first explicitly stated in *Hans* v. *Louisiana, supra*—that the Constitution was not intended to "rais[e] up" any proceedings against the States that were "anomalous and unheard of when the Constitution was adopted." *Id.,* at 18. We therefore attribute great significance to the fact that States were not subject to private suits in administrative adjudications at the time of the founding or for many years thereafter. For instance, while the United States asserts that "state entities have long been subject to similar administrative

enforcement proceedings," Reply Brief for United States 12, the earliest example it provides did not occur until 1918, see *id.*, at 14 (citing *California Canneries Co.* v. *Southern Pacific Co.*, 51 I. C. C. 500 (1918)).

B

To decide whether the *Hans* presumption applies here, however, we must examine FMC adjudications to determine whether they are the type of proceedings from which the Framers would have thought the States possessed immunity when they agreed to enter the Union.

In another case asking whether an immunity present in the judicial context also applied to administrative adjudications, this Court considered whether ALJs share the same absolute immunity from suit as do Article III judges. See *Butz* v. *Economou*, 438 U. S. 478 (1978). Examining in that case the duties performed by an ALJ, this Court observed:

"There can be little doubt that the role of the modern federal hearing examiner or administrative law judge . . . is 'functionally comparable' to that of a judge. His powers are often, if not generally, comparable to those of a trial judge: He may issue subpoenas, rule on proffers of evidence, regulate the course of the hearing, and make or recommend decisions. More importantly, the process of agency adjudication is currently structured so as to assure that the hearing examiner exercises his independent judgment on the evidence before him, free from pressures by the parties or other officials within the agency." *Id.*, at 513 (citation omitted).

Beyond the similarities between the role of an ALJ and that of a trial judge, this Court also noted the numerous common features shared by administrative adjudications and judicial proceedings:

"[F]ederal administrative law requires that agency adjudication contain many of the same safeguards as are

available in the judicial process. The proceedings are adversary in nature. They are conducted before a trier of fact insulated from political influence. A party is entitled to present his case by oral or documentary evidence, and the transcript of testimony and exhibits together with the pleadings constitute the exclusive record for decision. The parties are entitled to know the findings and conclusions on all of the issues of fact, law, or discretion presented on the record." *Ibid.* (citations omitted).

This Court therefore concluded in *Butz* that ALJs were "entitled to absolute immunity from damages liability for their judicial acts." *Id.*, at 514.

Turning to FMC adjudications specifically, neither the Commission nor the United States disputes the Court of Appeals' characterization below that such a proceeding "walks, talks, and squawks very much like a lawsuit." 243 F. 3d, at 174. Nor do they deny that the similarities identified in *Butz* between administrative adjudications and trial court proceedings are present here. See 46 CFR § 502.142 (2001).

A review of the FMC's Rules of Practice and Procedure confirms that FMC administrative proceedings bear a remarkably strong resemblance to civil litigation in federal courts. For example, the FMC's Rules governing pleadings are quite similar to those found in the Federal Rules of Civil Procedure. A case is commenced by the filing of a complaint. See 46 CFR § 502.61 (2001); Fed. Rule Civ. Proc. 3. The defendant then must file an answer, generally within 20 days of the date of service of the complaint, see § 502.64(a); Rule 12(a)(1), and may also file a motion to dismiss, see § 502.227(b)(1); Rule 12(b). A defendant is also allowed to file counterclaims against the plaintiff. See § 502.64(d); Rule 13. If a defendant fails to respond to a complaint, default judgment may be entered on behalf of the plaintiff. See § 502.64(b); Rule 55. Intervention is also allowed. See § 502.72; Rule 24.

Likewise, discovery in FMC adjudications largely mirrors discovery in federal civil litigation. See 46 U. S. C. App. § 1711(a)(1) (1994 ed.) (instructing that in FMC adjudicatory proceedings "discovery procedures . . . , to the extent practicable, shall be in conformity with the rules applicable in civil proceedings in the district courts of the United States"). In both types of proceedings, parties may conduct depositions, see, e. g., 46 CFR § 502.202 (2001); Fed. Rule Civ. Proc. 28, which are governed by similar requirements. Compare §§ 502.202, 502.203, and 502.204, with Rules 28, 29, 30, and 31. Parties may also discover evidence by: (1) serving written interrogatories, see § 502.205; Rule 33; (2) requesting that another party either produce documents, see § 502.206(a)(1); Rule 34(a)(1), or allow entry on that party's property for the purpose of inspecting the property or designated objects thereon, § 502.206(a)(2); Rule 34(a)(2); and (3) submitting requests for admissions, § 502.207; Rule 36. And a party failing to obey discovery orders in either type of proceeding is subject to a variety of sanctions, including the entry of default judgment. See § 502.210(a); Rule 37(b)(2).

Not only are discovery procedures virtually indistinguishable, but the role of the ALJ, the impartial officer[9] designated to hear a case, see § 502.147, is similar to that of an Article III judge. An ALJ has the authority to "arrange and give notice of hearing." *Ibid.* At that hearing, he may

"prescribe the order in which evidence shall be presented; dispose of procedural requests or similar matters; hear and rule upon motions; administer oaths and affirmations; examine witnesses; direct witnesses to testify or produce evidence available to them which will aid in the determination of any question of fact in issue; rule

[9] See 46 CFR § 502.224 (2001) (requiring that ALJs be shielded from political influence in a manner consistent with the Administrative Procedure Act).

upon offers of proof . . . and dispose of any other matter that normally and properly arises in the course of proceedings." *Ibid.*

The ALJ also fixes "the time and manner of filing briefs," § 502.221(a), which contain findings of fact as well as legal argument, see § 502.221(d)(1). After the submission of these briefs, the ALJ issues a decision that includes "a statement of findings and conclusions, as well as the reasons or basis therefor, upon all the material issues presented on the record, and the appropriate rule, order, section, relief, or denial thereof." § 502.223. Such relief may include an order directing the payment of reparations to an aggrieved party. See 46 U. S. C. App. § 1710(g) (1994 ed., Supp. V); 46 CFR § 502.251 (2001). The ALJ's ruling subsequently becomes the final decision of the FMC unless a party, by filing exceptions, appeals to the Commission or the Commission decides to review the ALJ's decision "on its own initiative." § 502.227(a)(3). In cases where a complainant obtains reparations, an ALJ may also require the losing party to pay the prevailing party's attorney's fees. See 46 U. S. C. App. § 1710(g); 46 CFR § 502.254 (2001).

In short, the similarities between FMC proceedings and civil litigation are overwhelming. In fact, to the extent that situations arise in the course of FMC adjudications "which are not covered by a specific Commission rule," the FMC's own Rules of Practice and Procedure specifically provide that "the Federal Rules of Civil Procedure will be followed to the extent that they are consistent with sound administrative practice."[10] § 502.12.

---

[10] In addition, "[u]nless inconsistent with the requirements of the Administrative Procedure Act and [the FMC's Rules of Practice and Procedure], the Federal Rules of Evidence [are] applicable" in FMC adjudicative proceedings. § 502.156.

## C

The preeminent purpose of state sovereign immunity is to accord States the dignity that is consistent with their status as sovereign entities. See *In re Ayers,* 123 U. S. 443, 505 (1887). "The founding generation thought it 'neither becoming nor convenient that the several States of the Union, invested with that large residuum of sovereignty which had not been delegated to the United States, should be summoned as defendants to answer the complaints of private persons.'" *Alden,* 527 U. S., at 748 (quoting *In re Ayers, supra,* at 505).

Given both this interest in protecting States' dignity and the strong similarities between FMC proceedings and civil litigation, we hold that state sovereign immunity bars the FMC from adjudicating complaints filed by a private party against a nonconsenting State. Simply put, if the Framers thought it an impermissible affront to a State's dignity to be required to answer the complaints of private parties in federal courts, we cannot imagine that they would have found it acceptable to compel a State to do exactly the same thing before the administrative tribunal of an agency, such as the FMC. Cf. *Alden, supra,* at 749 ("Private suits against nonconsenting States . . . present 'the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties,' *regardless of the forum*" (quoting *In re Ayers, supra,* at 505) (citations omitted; emphasis added)). The affront to a State's dignity does not lessen when an adjudication takes place in an administrative tribunal as opposed to an Article III court.[11] In both instances, a State is required to defend itself in an adversarial proceeding

---

[11] One, in fact, could argue that allowing a private party to haul a State in front of such an administrative tribunal constitutes a greater insult to a State's dignity than requiring a State to appear in an Article III court presided over by a judge with life tenure nominated by the President of the United States and confirmed by the United States Senate.

against a private party before an impartial federal officer.[12] Moreover, it would be quite strange to prohibit Congress from exercising its Article I powers to abrogate state sovereign immunity in Article III judicial proceedings, see *Seminole Tribe*, 517 U. S., at 72, but permit the use of those same Article I powers to create court-like administrative tribunals where sovereign immunity does not apply.[13]

## D

The United States suggests two reasons why we should distinguish FMC administrative adjudications from judicial proceedings for purposes of state sovereign immunity. Both of these arguments are unavailing.

## 1

The United States first contends that sovereign immunity should not apply to FMC adjudications because the Commission's orders are not self-executing. See Brief for United States 18–21. Whereas a court may enforce a judgment through the exercise of its contempt power, the FMC cannot enforce its own orders. Rather, the Commission's orders

---

[12] Contrary to the suggestion contained in JUSTICE BREYER's dissenting opinion, our "basic analogy" is not "between a federal administrative proceeding triggered by a private citizen and a private citizen's lawsuit against a State" in a State's own courts. *Post*, at 779. Rather, as our discussion above makes clear, the more apt comparison is between a complaint filed by a private party against a State with the FMC and a lawsuit brought by a private party against a State in federal court.

[13] While JUSTICE BREYER asserts by use of analogy that this case implicates the First Amendment right of citizens to petition the Federal Government for a redress of grievances, see *ibid.*, the Constitution no more protects a citizen's right to litigate against a State in front of a federal administrative tribunal than it does a citizen's right to sue a State in federal court. Both types of proceedings were "anomalous and unheard of when the Constitution was adopted," *Hans* v. *Louisiana*, 134 U. S. 1, 18 (1890), and a private party plainly has no First Amendment right to haul a State in front of either an Article III court or a federal administrative tribunal.

can only be enforced by a federal district court. See, *e. g.,* 46 U. S. C. App. § 1712(e) (1994 ed.) (enforcement of civil penalties); §§ 1713(c) and (d) (enforcement of nonreparation and reparation orders).

The United States presents a valid distinction between the authority possessed by the FMC and that of a court. For purposes of this case, however, it is a distinction without a meaningful difference. To the extent that the United States highlights this fact in order to suggest that a party alleged to have violated the Shipping Act is not coerced to participate in FMC proceedings, it is mistaken. The relevant statutory scheme makes it quite clear that, absent sovereign immunity, States would effectively be required to defend themselves against private parties in front of the FMC.

A State seeking to contest the merits of a complaint filed against it by a private party must defend itself in front of the FMC or substantially compromise its ability to defend itself at all. For example, once the FMC issues a nonreparation order, and either the Attorney General or the injured private party seeks enforcement of that order in a federal district court,[14] the sanctioned party is *not* permitted to litigate the merits of its position in that court. See § 1713(c) (limiting district court review to whether the relevant order "was properly made and duly issued"). Moreover, if a party fails to appear before the FMC, it may not then argue the merits of its position in an appeal of the Commission's determination filed under 28 U. S. C. § 2342(3)(B)(iv). See *United States* v. *L. A. Tucker Truck Lines, Inc.,* 344 U. S. 33, 37 (1952) ("Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but

---

[14] A reparation order issued by the FMC, by contrast, may be enforced in a United States district court only in an action brought by the injured private party. See Part IV–B, *infra.* 46 U. S. C. App. § 1713(d) (1994 ed.).

has erred against objection made at the time appropriate under its practice").

Should a party choose to ignore an order issued by the FMC, the Commission may impose monetary penalties for each day of noncompliance. See 46 U. S. C. App. § 1712(a) (1994 ed., Supp. V). The Commission may then request that the Attorney General of the United States seek to recover the amount assessed by the Commission in federal district court, see § 1712(e) (1994 ed.), and a State's sovereign immunity would not extend to that action, as it is one brought by the United States. Furthermore, once the FMC issues an order assessing a civil penalty, a sanctioned party may not later contest the merits of that order in an enforcement action brought by the Attorney General in federal district court. See *ibid.* (limiting review to whether the assessment of the civil penalty was "regularly made and duly issued"); *United States* v. *Interlink Systems, Inc.*, 984 F. 2d 79, 83 (CA2 1993) (holding that review of whether an order was "regularly made and duly issued" does not include review of the merits of the FMC's order).

Thus, any party, including a State, charged in a complaint by a private party with violating the Shipping Act is faced with the following options: appear before the Commission in a bid to persuade the FMC of the strength of its position or stand defenseless once enforcement of the Commission's nonreparation order or assessment of civil penalties is sought in federal district court.[15] To conclude that this choice does

---

[15] While JUSTICE BREYER argues that States' access to "full judicial review" of the Commission's orders mitigates any coercion to participate in FMC adjudicative proceedings, *post*, at 784, he earlier concedes that a State must appear before the Commission in order "to obtain full judicial review of an adverse agency decision in a court of appeals," *post*, at 783. This case therefore does not involve a situation where Congress has allowed a party to obtain full *de novo* judicial review of Commission orders without first appearing before the Commission, and we express no opinion as to whether sovereign immunity would apply to FMC adjudicative proceedings under such circumstances.

not coerce a State to participate in an FMC adjudication would be to blind ourselves to reality.[16]

The United States and JUSTICE BREYER maintain that any such coercion to participate in FMC proceedings is permissible because the States have consented to actions brought by the Federal Government. See *Alden*, 527 U. S., at 755–756 ("In ratifying the Constitution, the States consented to suits brought by . . . the Federal Government"). The Attorney General's decision to bring an enforcement action against a State after the conclusion of the Commission's proceedings, however, does not retroactively convert an FMC adjudication initiated and pursued by a private party into one initiated and pursued by the Federal Government. The prosecution of a complaint filed by a private party with the FMC is plainly not controlled by the United States, but rather is controlled by that private party; the only duty assumed by the FMC, and hence the United States, in conjunction with a private complaint is to assess its merits in an impartial manner. Indeed, the FMC does not even have the discretion to refuse to adjudicate complaints brought by private parties. See, *e. g.*, 243 F. 3d, at 176 ("The FMC had no choice but to adjudicate this dispute"). As a result, the United States plainly does not "exercise . . . political responsibility" for such complaints, but instead has impermissibly effected "a broad delegation to private persons to sue nonconsenting States."[17] *Alden, supra,* at 756.

---

[16] JUSTICE BREYER's observation that private citizens may pressure the Federal Government in a variety of ways to take *other* actions that affect States is beside the point. See *post,* at 783–784. Sovereign immunity concerns are not implicated, for example, when the Federal Government enacts a rule opposed by a State. See *post,* at 784. It is an entirely different matter, however, when the Federal Government attempts to coerce States into answering the complaints of private parties in an adjudicative proceeding. See Part III–C, *supra.*

[17] Moreover, a State obviously will not know *ex ante* whether the Attorney General will choose to bring an enforcement action. Therefore, it is

## 2

The United States next suggests that sovereign immunity should not apply to FMC proceedings because they do not present the same threat to the financial integrity of States as do private judicial suits. See Brief for United States 21. The Government highlights the fact that, in contrast to a nonreparation order, for which the Attorney General may seek enforcement at the request of the Commission, a reparation order may be enforced in a United States district court only in an action brought by the private party to whom the award was made. See 46 U. S. C. App. § 1713(d)(1). The United States then points out that a State's sovereign immunity would extend to such a suit brought by a private party. Brief for United States 21.

This argument, however, reflects a fundamental misunderstanding of the purposes of sovereign immunity. While state sovereign immunity serves the important function of shielding state treasuries and thus preserving "the States' ability to govern in accordance with the will of their citizens," *Alden, supra,* at 750–751, the doctrine's central purpose is to "accord the States the respect owed them as" joint sovereigns. See *Puerto Rico Aqueduct and Sewer Authority* v. *Metcalf & Eddy, Inc.,* 506 U. S. 139, 146 (1993); see Part III–C, *supra.* It is for this reason, for instance, that sovereign immunity applies regardless of whether a private plaintiff's suit is for monetary damages or some other type of relief. See *Seminole Tribe,* 517 U. S., at 58 ("[W]e have often made it clear that the relief sought by a plaintiff suing

---

the mere prospect that he may do so that coerces a State to participate in FMC proceedings. For if a State does not present its arguments to the Commission, it will have all but lost any opportunity to defend itself in the event that the Attorney General later decides to seek enforcement of a Commission order or the Commission's assessment of civil penalties. See *supra,* at 762–764.

a State is irrelevant to the question whether the suit is barred by the Eleventh Amendment").

Sovereign immunity does not merely constitute a defense to monetary liability or even to all types of liability. Rather, it provides an immunity from suit. The statutory scheme, as interpreted by the United States, is thus no more permissible than if Congress had allowed private parties to sue States in federal court for violations of the Shipping Act but precluded a court from awarding them any relief.

It is also worth noting that an FMC order that a State pay reparations to a private party may very well result in the withdrawal of funds from that State's treasury. A State subject to such an order at the conclusion of an FMC adjudicatory proceeding would either have to make the required payment to the injured private party or stand in violation of the Commission's order. If the State were willfully and knowingly to choose noncompliance, the Commission could assess a civil penalty of up to $25,000 a day against the State. See 46 U. S. C. App. § 1712(a) (1994 ed., Supp. V). And if the State then refused to pay that penalty, the Attorney General, at the request of the Commission, could seek to recover that amount in a federal district court; because that action would be one brought by the Federal Government, the State's sovereign immunity would not extend to it.

To be sure, the United States suggests that the FMC's statutory authority to impose civil penalties for violations of reparation orders is "doubtful." Reply Brief for United States 7. The relevant statutory provisions, however, appear on their face to confer such authority. For while reparation orders and nonreparation orders are distinguished in other parts of the statutory scheme, see, e. g., 46 U. S. C. App. §§ 1713(c) and (d) (1994 ed.), the provision addressing civil penalties makes no such distinction. See § 1712(a) (1994 ed., Supp. V) ("Whoever violates . . . a Commission order is liable to the United States for a civil penalty"). The United

States, moreover, does not even dispute that the FMC could impose a civil penalty on a State for failing to obey a nonreparation order, which, if enforced by the Attorney General, would also result in a levy upon that State's treasury.

## IV

Two final arguments raised by the FMC and the United States remain to be addressed. Each is answered in part by reference to our decision in *Seminole Tribe.*

## A

The FMC maintains that sovereign immunity should not bar the Commission from adjudicating Maritime Services' complaint because "[t]he constitutional necessity of uniformity in the regulation of maritime commerce limits the States' sovereignty with respect to the Federal Government's authority to regulate that commerce." Brief for Petitioner 29. This Court, however, has already held that the States' sovereign immunity extends to cases concerning maritime commerce. See, *e. g., Ex parte New York,* 256 U. S. 490 (1921). Moreover, *Seminole Tribe* precludes us from creating a new "maritime commerce" exception to state sovereign immunity. Although the Federal Government undoubtedly possesses an important interest in regulating maritime commerce, see U. S. Const., Art. I, § 8, cl. 3, we noted in *Seminole Tribe* that "the background principle of state sovereign immunity embodied in the Eleventh Amendment is not so ephemeral as to dissipate when the subject of the suit is an area . . . that is under the exclusive control of the Federal Government," [18] 517 U. S., at 72. Thus, "[e]ven when the Constitu-

---

[18] JUSTICE BREYER apparently does not accept this proposition, see *post,* at 776–778, maintaining that it is not supported by the text of the Tenth Amendment. The principle of state sovereign immunity enshrined in our constitutional framework, however, is not rooted in the Tenth Amendment. See Part II, *supra.* Moreover, to the extent that JUSTICE BREYER ar-

tion vests in Congress complete lawmaking authority over a particular area, the Eleventh Amendment prevents congressional authorization of suits by private parties against unconsenting States." *Ibid.* Of course, the Federal Government retains ample means of ensuring that state-run ports comply with the Shipping Act and other valid federal rules governing ocean-borne commerce. The FMC, for example, remains free to investigate alleged violations of the Shipping Act, either upon its own initiative or upon information supplied by a private party, see, *e. g.,* 46 CFR § 502.282 (2001), and to institute its own administrative proceeding against a state-run port, see 46 U. S. C. App. § 1710(c) (1994 ed.); 46 CFR § 502.61(a) (2001). Additionally, the Commission "may bring suit in a district court of the United States to enjoin conduct in violation of [the Act]." 46 U. S. C. App. § 1710(h)(1).[19] Indeed, the United States has advised us that the Court of Appeals' ruling below "should have little practical effect on the FMC's enforcement of the Shipping Act," Brief for United States in Opposition 20, and we have no reason to believe that our decision to affirm that judgment will lead to the parade of horribles envisioned by the FMC.

## B

Finally, the United States maintains that even if sovereign immunity were to bar the FMC from adjudicating a private

gues that the Federal Government's Article I power "[t]o regulate Commerce with foreign Nations, and among the several States," U. S. Const., Art. I, § 8, cl. 3, allows it to authorize private parties to sue nonconsenting States, see *post,* at 777–778, his quarrel is not with our decision today but with our decision in *Seminole Tribe of Fla.* v. *Florida,* 517 U. S. 44 (1996). See *id.,* at 72.

[19] For these reasons, private parties remain "perfectly free to complain to the Federal Government about unlawful state activity" and "the Federal Government [remains] free to take subsequent legal action." *Post,* at 776 (BREYER, J., dissenting). The only step the FMC may not take, consistent with this Court's sovereign immunity jurisprudence, is to adjudicate a dispute between a private party and a nonconsenting State.

party's complaint against a state-run port for purposes of issuing a reparation order, the FMC should not be precluded from considering a private party's request for other forms of relief, such as a cease-and-desist order. See Brief for United States 32–34. As we have previously noted, however, the primary function of sovereign immunity is not to protect state treasuries, see Part III–C, *supra,* but to afford the States the dignity and respect due sovereign entities. As a result, we explained in *Seminole Tribe* that "the relief sought by a plaintiff suing a State is irrelevant to the question whether the suit is barred by the Eleventh Amendment." 517 U. S., at 58. We see no reason why a different principle should apply in the realm of administrative adjudications.

\* \* \*

While some might complain that our system of dual sovereignty is not a model of administrative convenience, see, *e. g., post,* at 785–786 (BREYER, J., dissenting), that is not its purpose. Rather, "[t]he 'constitutionally mandated balance of power' between the States and the Federal Government was adopted by the Framers to ensure the protection of 'our fundamental liberties.'" *Atascadero State Hospital* v. *Scanlon,* 473 U. S. 234, 242 (1985) (quoting *Garcia* v. *San Antonio Metropolitan Transit Authority,* 469 U. S. 528, 572 (1985) (Powell, J., dissenting)). By guarding against encroachments by the Federal Government on fundamental aspects of state sovereignty, such as sovereign immunity, we strive to maintain the balance of power embodied in our Constitution and thus to "reduce the risk of tyranny and abuse from either front." *Gregory* v. *Ashcroft,* 501 U. S., at 458. Although the Framers likely did not envision the intrusion on state sovereignty at issue in today's case, we are nonetheless confident that it is contrary to their constitutional design, and therefore affirm the judgment of the Court of Appeals.

*It is so ordered.*

JUSTICE STEVENS, dissenting.

JUSTICE BREYER has explained why the Court's recent sovereign immunity jurisprudence does not support today's decision. I join his opinion without reservation, but add these words to emphasize the weakness of the two predicates for the majority's holding. Those predicates are, first, the Court's recent decision in *Alden* v. *Maine*, 527 U. S. 706 (1999), and second, the "preeminent" interest in according States the "dignity" that is their due. *Ante*, at 760.

JUSTICE SOUTER has already demonstrated that *Alden*'s creative "conception of state sovereign immunity . . . is true neither to history nor to the structure of the Constitution." 527 U. S., at 814 (dissenting opinion). And I have previously explained that the "dignity" rationale is "'embarrassingly insufficient,'" *Seminole Tribe of Fla.* v. *Florida*, 517 U. S. 44, 97 (1996) (dissenting opinion; citation omitted), in part because "Chief Justice Marshall early on laid to rest the view that the purpose of the Eleventh Amendment was to protect a State's dignity," *id.*, at 96–97 (citing *Cohens* v. *Virginia*, 6 Wheat. 264, 406–407 (1821)).

This latter point is reinforced by the legislative history of the Eleventh Amendment. It is familiar learning that the Amendment was a response to this Court's decision in *Chisholm* v. *Georgia*, 2 Dall. 419 (1793). Less recognized, however, is that *Chisholm* necessarily decided two jurisdictional issues: that the Court had personal jurisdiction over the state defendant, and that it had subject-matter jurisdiction over the case.[1] The first proposed draft of a constitutional amendment responding to *Chisholm*—introduced in the House of Representatives in February 1793, on the day after *Chisholm* was decided—would have overruled the first

---

[1] See Nelson, Sovereign Immunity as a Doctrine of Personal Jurisdiction, 115 Harv. L. Rev. 1561, 1565–1566 (2002).

holding, but not the second.[2]  That proposal was not adopted.   Rather, a proposal introduced the following day in the Senate,[3] which was "cast in terms that we associate with subject matter jurisdiction,"[4] provided the basis for the present text of the Eleventh Amendment.

This legislative history suggests that the Eleventh Amendment is best understood as having overruled *Chisholm*'s subject-matter jurisdiction holding, thereby restricting the federal courts' diversity jurisdiction.   However, the Amendment left intact *Chisholm*'s personal jurisdiction holding: that the Constitution does not immunize States from a federal court's process.   If the paramount concern of the Eleventh Amendment's framers had been protecting the so-called "dignity" interest of the States, surely Congress would have endorsed the first proposed amend-

---

[2] The House proposal read: "[N]o state shall be liable to be made a party defendant, in any of 'the judicial courts, established, or which shall be established under the authority of the United States, at the suit of any person or persons, whether a citizen or citizens, or a foreigner or foreigners, or of any body politic or corporate, whether within or without the United States."  *Id.*, at 1602, and n. 211 (quoting Proceedings of the United States House of Representatives (Feb. 19, 1793), Gazette of the United States, Feb. 20, 1793, reprinted in 5 Documentary History of the Supreme Court of the United States, 1789–1800, pp. 605–606 (M. Marcus ed. 1994)) (internal quotation marks omitted).

[3] The Senate proposal read: "The Judicial Power of the United States shall not extend to any Suits in Law or Equity commenced or prosecuted against any one of the United States by Citizens of another State or by Citizens or Subjects of any foreign State."  Nelson, *supra*, at 1603, and n. 212 (quoting Resolution in the United States Senate (Feb. 20, 1793), reprinted in 5 Documentary History of the Supreme Court, *supra*, at 607–608) (internal quotation marks omitted).  The Senate version closely tracked the ultimate language of the Eleventh Amendment.  See U. S. Const., Amdt. 11 ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State").

[4] Nelson, *supra*, at 1603.

ment granting the States immunity from process, rather than the later proposal that merely delineates the subject-matter jurisdiction of courts. Moreover, as Chief Justice Marshall recognized, a subject-matter reading of the Amendment makes sense, considering the States' interest in avoiding their creditors. See *Cohens* v. *Virginia*, 6 Wheat., at 406–407.

The reasons why the majority in *Chisholm* concluded that the "dignity" interests underlying the sovereign immunity of English Monarchs had not been inherited by the original 13 States remain valid today. See, *e. g., Seminole Tribe of Fla.*, 517 U. S., at 95–97 (STEVENS, J., dissenting). By extending the untethered "dignity" rationale to the context of routine federal administrative proceedings, today's decision is even more anachronistic than *Alden*.

JUSTICE BREYER, with whom JUSTICE STEVENS, JUSTICE SOUTER, and JUSTICE GINSBURG join, dissenting.

The Court holds that a private person cannot bring a complaint against a State to a federal administrative agency where the agency (1) will use an internal adjudicative process to decide if the complaint is well founded, and (2) if so, proceed to court to enforce the law. Where does the Constitution contain the principle of law that the Court enunciates? I cannot find the answer to this question in any text, in any tradition, or in any relevant purpose. In saying this, I do not simply reiterate the dissenting views set forth in many of the Court's recent sovereign immunity decisions. See, *e. g., Kimel* v. *Florida Bd. of Regents*, 528 U. S. 62 (2000); *Alden* v. *Maine*, 527 U. S. 706 (1999); *College Savings Bank* v. *Florida Prepaid Postsecondary Ed. Expense Bd.*, 527 U. S. 666 (1999); *Seminole Tribe of Fla.* v. *Florida*, 517 U. S. 44 (1996). For even were I to believe that those decisions properly stated the law—which I do not—I still could not accept the Court's conclusion here.

I

At the outset one must understand the constitutional nature of the legal proceeding before us. The legal body conducting the proceeding, the Federal Maritime Commission, is an "independent" federal agency. Constitutionally speaking, an "independent" agency belongs neither to the Legislative Branch nor to the Judicial Branch of Government. Although Members of this Court have referred to agencies as a "fourth branch" of Government, *FTC* v. *Ruberoid Co.*, 343 U. S. 470, 487 (1952) (Jackson, J., dissenting), the agencies, even "independent" agencies, are more appropriately considered to be part of the Executive Branch. See *Freytag* v. *Commissioner*, 501 U. S. 868, 910 (1991) (SCALIA, J., concurring in part and concurring in judgment). The President appoints their chief administrators, typically a Chairman and Commissioners, subject to confirmation by the Senate. Cf. *Bowsher* v. *Synar*, 478 U. S. 714, 723 (1986). The agencies derive their legal powers from congressionally enacted statutes. And the agencies enforce those statutes, *i. e.*, they "execute" them, in part by making rules or by adjudicating matters in dispute. Cf. *Panama Refining Co.* v. *Ryan*, 293 U. S. 388, 428–429 (1935).

The Court long ago laid to rest any constitutional doubts about whether the Constitution permitted Congress to delegate rulemaking and adjudicative powers to agencies. *E. g.*, *ICC* v. *Cincinnati, N. O. & T. P. R. Co.*, 167 U. S. 479, 494–495 (1897) (permitting rulemaking); *Crowell* v. *Benson*, 285 U. S. 22, 46 (1932) (permitting adjudication); *Commodity Futures Trading Comm'n* v. *Schor*, 478 U. S. 833, 852 (1986) (same). That, in part, is because the Court established certain safeguards surrounding the exercise of these powers. See, *e. g.*, *A. L. A. Schechter Poultry Corp.* v. *United States*, 295 U. S. 495 (1935) (nondelegation doctrine); *Crowell*, *supra* (requiring judicial review). And the Court denied that those activities as safeguarded, however much they might *resemble* the activities of a legislature or court, fell within the

scope of Article I or Article III of the Constitution.. *Schechter Poultry, supra,* at 529–530; *Crowell, supra,* at 50–53; see also *INS* v. *Chadha,* 462 U. S. 919, 953, n. 16 (1983) (agency's use of rulemaking "resemble[s]," but is not, lawmaking). Consequently, in exercising those powers, the agency is engaging in an Article II, Executive Branch activity. And the powers it is exercising are powers that the Executive Branch of Government must possess if it is to enforce modern law through administration.

This constitutional understanding explains why both commentators and courts have often attached the prefix "quasi" to descriptions of an agency's rulemaking or adjudicative functions. *E. g., Humphrey's Executor* v. *United States,* 295 U. S. 602, 629 (1935); 3 C. Koch, Administrative Law and Practice § 12.13 (2d ed. 1997); Shapiro, The Choice of Rulemaking or Adjudication in the Development of Administrative Policy, 78 Harv. L. Rev. 921, 954–958 (1965); Friendly, The Federal Administrative Agencies: The Need for Better Definition of Standards, 75 Harv. L. Rev. 863, 869–870 (1962). The terms *"quasi* legislative" and *"quasi* adjudicative" indicate that the agency uses legislative *like* or court *like* procedures but that it is not, constitutionally speaking, either a legislature or a court. See *Whitman* v. *American Trucking Assns., Inc.,* 531 U. S. 457, 472–473 (2001); *Freytag, supra,* at 910 (SCALIA, J., concurring in part and concurring in judgment).

The case before us presents a fairly typical example of a federal administrative agency's use of agency adjudication. Congress has enacted a statute, the Shipping Act of 1984 (Act or Shipping Act), 46 U. S. C. App. § 1701 *et seq.* (1994 ed. and Supp. V), which, among other things, forbids marine terminal operators to discriminate against terminal users. § 1709(d)(4) (1994 ed., Supp. V). The Act grants the Federal Maritime Commission the authority to administer the Act. The law grants the Commission the authority to enforce the Act in a variety of ways, for example, by making rules and

regulations, § 1716 (1994 ed.), by issuing or revoking licenses, § 1718 (1994 ed., Supp. V), and by conducting investigations and issuing reports, see generally § 1710 (1994 ed. and Supp. V). It also permits a private person to file a complaint, which the Commission is to consider. § 1710(a) (1994 ed.). Interestingly enough, it does not say that the Commission must determine the merits of the complaint through agency adjudication, see § 1710(g) (1994 ed., Supp. V)—though, for present purposes, I do not see that this statutory lacuna matters.

Regardless, the Federal Maritime Commission has decided to evaluate complaints through an adjudicative process. That process involves assignment to an administrative law judge, 46 CFR § 502.146(a) (2001), a hearing, an initial decision, §§ 502.147, 502.223, Commission review, and a final Commission decision, § 502.227, followed by federal appellate court review, 28 U. S. C. § 2342(3)(B). The initial hearing, like a typical court hearing, involves a neutral decision-maker, an opportunity to present a case or defense through oral or documentary evidence, a right to cross-examination, and a written record that typically constitutes the basis for decision. 46 CFR § 502.154 (2001). But unlike a typical court proceeding, the agency process also may involve considerable hearsay, resolution of factual disputes through the use of "official notice," § 502.156; see also 5 U. S. C. § 556, and final decisionmaking by a Commission that remains free to disregard the initial decision and decide the matter on its own—indeed through the application of substantive as well as procedural rules, that it, the Commission, itself has created. See 46 CFR §§ 502.226, 502.227, 502.230 (2001); see also 46 U. S. C. App. § 1716 (1994 ed.) (rulemaking authority); 46 CFR §§ 502.51–502.56 (2001) (same).

The outcome of this process is often a Commission order, say, an order that tells a party to cease and desist from certain activity or that tells one party to pay money damages (called "reparations") to another. The Commission cannot

itself enforce such an order. See 46 U. S. C. App. § 1712(e). Rather, the Shipping Act says that, to obtain enforcement of an order providing for money damages, the private party beneficiary of the order must obtain a court order. § 1713(d). It adds that, to obtain enforcement of other commission orders, either the private party or the Attorney General must go to court. § 1713(c). It also permits the Commission to seek a court injunction prohibiting any person from violating the Shipping Act. § 1710(g) (1994 ed., Supp. V). And it authorizes the Commission to assess civil penalties (payable to the United States) against a person who fails to obey a Commission order; but to collect the penalties, the Commission, again, must go to court. §§ 1712(a), (c) (1994 ed. and Supp. V).

The upshot is that this case involves a typical Executive Branch agency exercising typical Executive Branch powers seeking to determine whether a particular person has violated federal law. Cf. 2 K. Davis & R. Pierce, Administrative Law Treatise 37–38 (1994) (describing typical agency characteristics); cf. also *SEC* v. *Chenery Corp.*, 332 U. S. 194 (1947). The particular person in this instance is a state entity, the South Carolina State Ports Authority, and the agency is acting in response to the request of a private individual. But at first blush it is difficult to see why these special circumstances matter. After all, the Constitution created a Federal Government empowered to enact laws that would bind the States and it empowered that Federal Government to enforce those laws against the States. See *Knickerbocker Ice Co.* v. *Stewart*, 253 U. S. 149, 160 (1920). It also left private individuals perfectly free to complain to the Federal Government about unlawful state activity, and it left the Federal Government free to take subsequent legal action. Where then can the Court find its constitutional principle—the principle that the Constitution forbids an Executive Branch agency to determine through ordinary adjudicative processes whether such a private complaint is

justified? As I have said, I cannot find that principle anywhere in the Constitution.

## II

The Court's principle lacks any firm anchor in the Constitution's text. The Eleventh Amendment cannot help. It says:

> "The *Judicial* power of the United States shall not . . . extend to any suit . . . commenced or prosecuted against one of the . . . States by Citizens of another State." (Emphasis added.)

Federal administrative agencies do not exercise the "[j]udicial power of the United States." Compare *Crowell* v. *Benson,* 285 U. S. 22 (1932) (explaining why ordinary agency adjudication, with safeguards, is not an exercise of Article III power), with *Freytag* v. *Commissioner,* 501 U. S., at 890–891 (Tax Court, a special Article I court, exercises Article III power), and *Williams* v. *United States,* 289 U. S. 553, 565–566 (1933) (same as to Court of Claims). Of course, this Court has read the words "Citizens of another State" as if they also said "citizen of the same State." *Hans* v. *Louisiana,* 134 U. S. 1 (1890). But it has never said that the words "[j]udicial power of the United States" mean "the executive power of the United States." Nor should it.

The Tenth Amendment cannot help. It says:

> "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

The Constitution has "delegated to the United States" the power here in question, the power "[t]o regulate Commerce with foreign Nations, and among the several States." U. S. Const., Art. I, § 8, cl. 3; see *California* v. *United States,* 320 U. S. 577, 586 (1944). The Court finds within this delegation a hidden reservation, a reservation that, due to sovereign immunity, embodies the legal principle the Court enunciates.

But the text of the Tenth Amendment says nothing about any such hidden reservation, one way or the other.

Indeed, the Court refers for textual support only to an earlier case, namely, *Alden* v. *Maine*, 527 U. S. 706 (1999) (holding that sovereign immunity prohibits a private citizen from suing a State in state court), and, through *Alden*, to the texts that *Alden* mentioned. These textual references include: (1) what Alexander Hamilton described as a constitutional "postulate," namely, that the States retain their immunity from "suits, without their consent," unless there has been a "surrender" of that immunity "in the plan of the convention," *id.*, at 730 (internal quotation marks omitted); (2) what the *Alden* majority called "the system of federalism established by the Constitution," *ibid.;* and (3) what the *Alden* majority called "the constitutional design," *id.*, at 731. See also *id.*, at 760–762 (SOUTER, J., dissenting) (noting that the Court's opinion nowhere relied on constitutional text).

Considered purely as constitutional text, these words— "constitutional design," "system of federalism," and "plan of the convention"—suffer several defects. Their language is highly abstract, making them difficult to apply. They invite differing interpretations at least as much as do the Constitution's own broad liberty-protecting phrases, such as "due process of law" or the word "liberty" itself. And compared to these latter phrases, they suffer the additional disadvantage that they do not actually appear anywhere in the Constitution. Cf. generally *Harmelin* v. *Michigan*, 501 U. S. 957, 985–986 (1991). Regardless, unless supported by considerations of history, of constitutional purpose, or of related consequence, those abstract phrases cannot support today's result.

## III

Conceding that its conception of sovereign immunity is ungrounded in the Constitution's text, see *ante*, at 751–753, 767–768, n. 18, the Court attempts to support its holding with history. But this effort is similarly destined to fail, because

the very history to which the majority turned in *Alden* here argues against the Court's basic analogy—between a federal administrative proceeding triggered by a private citizen and a private citizen's lawsuit against a State.

In *Alden* the Court said that feudal law had created an 18th-century legal norm to the effect that "'no lord could be sued by a vassal in his own court, but each petty lord was subject to suit in the courts of a higher lord.'" 527 U. S., at 741. It added that the Framers' silence about the matter had woven that feudal "norm" into the "constitutional design," *i. e.*, had made it part of our "system of federalism" unchanged by the "'plan of the convention.'" *Id.*, at 714–717, 730, 740–743. And that norm, said the *Alden* Court, by analogy forbids a citizen ("vassal") to sue a State ("lord") in the "lord's" own courts. Here that same norm argues against immunity, for the forum at issue is federal—belonging by analogy to the "higher lord." And total 18th-century silence about state immunity in Article I proceedings would argue against, not in favor of, immunity.

In any event, the 18th century was not totally silent. The Framers enunciated in the "plan of the convention" the principle that the Federal Government may sue a State without its consent. See, *e. g.*, *West Virginia* v. *United States*, 479 U. S. 305, 311 (1987). They also described in the First Amendment the right of a citizen to petition the Federal Government for a redress of grievances. See also *United States* v. *Cruikshank*, 92 U. S. 542, 552–553 (1876); cf. generally Mark, The Vestigial Constitution: The History and Significance of the Right to Petition, 66 Ford. L. Rev. 2153, 2227 (1998). The first principle applies here because only the Federal Government, not the private party, can—in light of this Court's recent sovereign immunity jurisprudence, see *Seminole Tribe of Fla.* v. *Florida*, 517 U. S. 44 (1996)—bring the ultimate court action necessary legally to force a State to comply with the relevant federal law. See *id.*, at 71, n. 14. The second principle applies here be-

cause a private citizen has asked the Federal Government to determine whether the State has complied with federal law and, if not, to take appropriate legal action in court.

Of course these two principles apply only through analogy. (The Court's decision also relies on analogy—one that jumps the separation-of-powers boundary that the Constitution establishes.) Yet the analogy seems apt. A private citizen, believing that a State has violated federal law, seeks a determination by an Executive Branch agency that he is right; the agency will make that determination through use of its own adjudicatory agency processes; and, if the State fails to comply, the Federal Government may bring an action against the State in federal court to enforce the federal law.

Twentieth-century legal history reinforces the appropriateness of this description. The growth of the administrative state has led this Court to determine that administrative agencies are not Article III courts, see *Crowell* v. *Benson*, 285 U. S., at 49–53, that they have broad discretion to proceed either through agency adjudication or through rulemaking, *SEC* v. *Chenery Corp.*, 332 U. S., at 203 ("[T]he choice made between proceeding by general rule or by individual, *ad hoc* litigation is one that lies primarily in the informed discretion of the administrative agency"), and that they may bring administrative enforcement proceedings against States. At a minimum these historically established legal principles argue strongly against any effort to analogize the present proceedings to a lawsuit brought by a private individual against a State in a state court or to an Eleventh Amendment type lawsuit brought by a private individual against a State in a federal court.

This is not to say that the analogy (with a citizen petitioning for federal intervention) is, historically speaking, a perfect one. As the Court points out, the Framers may not have "anticipated the vast growth of the administrative state," and the history of their debates "does not provide direct guidance." *Ante*, at 755. But the Court is wrong to

ignore the relevance and importance of what the Framers did say. And it is doubly wrong to attach "great" legal "significance" to the absence of 18th- and 19th-century administrative agency experience. See *ibid.* Even if those alive in the 18th century did not "anticipat[e] the vast growth of the administrative state," *ibid.*, they did write a Constitution designed to provide a framework for Government across the centuries, a framework that is flexible enough to meet modern needs. And we cannot read their silence about particular means as if it were an instruction to forbid their use.

## IV

The Court argues that the basic purpose of "sovereign immunity" doctrine—namely, preservation of a State's "dignity"—requires application of that doctrine here. It rests this argument upon (1) its efforts to analogize agency proceedings to court proceedings, and (2) its claim that the agency proceedings constitute a form of "compulsion" exercised by a private individual against the State. As I have just explained, I believe its efforts to analogize agencies to courts are, constitutionally speaking, too frail to support its conclusion. Neither can its claim of "compulsion" provide the necessary support.

Viewed from a purely legal perspective, the "compulsion" claim is far too weak. That is because the private individual lacks the legal authority to compel the State to comply with the law. For as I have noted, in light of the Court's recent sovereign immunity decisions, if an individual does bring suit to enforce the Commission's order, see 46 U. S. C. App. § 1713 (1994 ed.), the State would arguably be free to claim sovereign immunity. See *Seminole Tribe of Fla., supra.* Only the Federal Government, acting through the Commission or the Attorney General, has the authority to compel the State to act.

In a typical instance, the private individual will file a complaint, the agency will adjudicate the complaint, and the

agency will reach a decision. The State subsequently may take the matter to court in order to obtain judicial review of any adverse agency ruling, but, if it does so, its opponent in that court proceeding is *not* a private party, but the agency itself. 28 U. S. C. § 2344. (And unlike some other administrative schemes, see, *e. g., Verizon Md. Inc.* v. *Public Serv. Comm'n of Md., ante,* at 651–653 (SOUTER, J., concurring), the Commission would not be a party in name only.) Alternatively, the State may do nothing, in which case either the Commission or the Attorney General must seek a court order compelling the State to obey. 46 U. S. C. App. §§ 1710, 1713 (1994 ed. and Supp. V). The Commission, but not a private party, may assess a penalty against the State for noncompliance, § 1712; and only a court acting at the Commission's request can compel compliance with a penalty order. In sum, no one can legally compel the State's obedience to the Shipping Act's requirements without a court order, and in no case would a court issue such an order (absent a State's voluntary waiver of sovereign immunity, see *Atascadero State Hospital* v. *Scanlon,* 473 U. S. 234, 238 (1985)) absent the request of a federal agency or other federal instrumentality.

In *Alden* this Court distinguished for sovereign immunity purposes between (a) a lawsuit brought by the Federal Government and (b) a lawsuit brought by a private person. It held that principles of "sovereign immunity" barred suit in the latter instance but not the former, because the former— a suit by the Federal Government—"require[s] the exercise of political responsibility for each suit prosecuted against a State." 527 U. S., at 756. That same "exercise of political responsibility" must take place here in every instance prior to the issuance of an order that, from a legal perspective, will compel the State to obey. To repeat: Without a court proceeding the private individual cannot legally force the State to act, to pay, or to desist; only the Federal Government may institute a court proceeding; and, in deciding

whether to do so, the Federal Government will exercise appropriate political responsibility. Cf. *ibid.*

Viewed from a practical perspective, the Court's "compulsion" claim proves far too much. Certainly, a private citizen's decision to file a complaint with the Commission can produce practical pressures upon the State to respond and eventually to comply with a Commission decision. By appearing before the Commission, the State will be able to obtain full judicial review of an adverse agency decision in a court of appeals (where it will face in opposition the Commission itself, not the private party). By appearing, the State will avoid any potential Commission-assessed monetary penalty. And by complying, it will avoid the adverse political, practical, and symbolic implications of being labeled a federal "lawbreaker."

Practical pressures such as these, however, cannot sufficiently "affront" a State's "dignity" as to warrant constitutional "sovereign immunity" protections, for it is easy to imagine comparable instances of clearly lawful private citizen complaints to Government that place a State under far greater practical pressures to comply. No one doubts, for example, that a private citizen can complain to Congress, which may threaten (should the State fail to respond) to enact a new law that the State opposes. Nor does anyone deny that a private citizen, in complaining to a federal agency, may seek a rulemaking proceeding, which may lead the agency (should the State fail to respond) to enact a new agency rule that the State opposes. A private citizen may ask an agency formally to declare that a State is not in compliance with a statute or federal rule, even though from that formal declaration may flow a host of legal consequences adverse to a State's interests. See, *e. g.*, 42 U. S. C. § 300g–3 (Environmental Protection Agency may declare that a State is in noncompliance with federal water quality regulations). And one can easily imagine a legal scheme in which a private individual files a complaint like the one before us, but asks

an agency staff member to investigate the matter, which investigation would lead to an order similar to the order at issue here with similar legal and practical consequences.

Viewed solely in terms of practical pressures, the pressures upon a State to respond before Congress or the agency, to answer the private citizen's accusations, to oppose his requests for legally adverse agency or congressional action, would seem no less powerful than those at issue here. Once one avoids the temptation to think (mistakenly) of an agency as a court, it is difficult to see why the practical pressures at issue here would "affront" a State's "dignity" any more than those just mentioned. And if the latter create no constitutional "dignity" problem, why should the former? The Court's answer—that "[s]overeign immunity concerns are not implicated" unless the "Federal Government attempts to coerce States into answering the complaints of private parties in an adjudicative proceeding," *ante*, at 764, n. 16—simply begs the question of *when* and *why* States should be entitled to special constitutional protection.

The Court's more direct response lies in its claim that the practical pressures here are special, arising from a set of statutes that deprive a nonresponding State of any meaningful judicial review of the agency's determinations. See *ante*, at 760–764. The Court does not explain just what makes this kind of pressure constitutionally special. But in any event, the Court's response is inadequate. The statutes clearly provide the State with full judicial review of the initial agency decision should the State choose to seek that review. 28 U. S. C. § 2342(3)(B)(iv). That review cannot "affront" the State's "dignity, for it takes place in a court proceeding in which the Commission, not the private party, will oppose the State. § 2344.

Even were that not so, Congress could easily resolve the resulting problem by making clear that the relevant statutes authorize full judicial review in an enforcement action brought against a State. For that matter, one might in-

terpret existing statutes as permitting in such actions whatever form of judicial review the Constitution demands. Cf. *Crowell* v. *Benson*, 285 U. S., at 45–47. Statutory language that authorizes review of whether an order was "properly made and duly issued," 46 U. S. C. App. § 1713(c), does not *forbid* review that the Constitution *requires*. But even were I to make the heroic assumption (which I do not believe) that this case implicates a reviewing court's statutory inability to apply constitutionally requisite standards of judicial review, I should still conclude that the Constitution permits the agency to consider the complaint here before us. The "review standards" problem concerns the later enforceability of the agency decision, and the Court must consider any such problem later in the context of a court order granting or denying review. *Ashwander* v. *TVA*, 297 U. S. 288, 347 (1936) (Brandeis, J., concurring) ("'It is not the habit of the Court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case'").

## V

The Court cannot justify today's decision in terms of its practical consequences. The decision, while permitting an agency to bring enforcement actions against States, forbids it to use agency adjudication in order to help decide whether to do so. Consequently the agency must rely more heavily upon its own informal staff investigations in order to decide whether a citizen's complaint has merit. The natural result is less agency flexibility, a larger federal bureaucracy, less fair procedure, and potentially less effective law enforcement. See *Pension Benefit Guaranty Corporation* v. *LTV Corp.*, 496 U. S. 633, 654–656 (1990); cf. also Shapiro, 78 Harv. L. Rev., at 921 ("One of the most distinctive aspects of the administrative process is the flexibility it affords in the selection of methods for policy formulation"). And at least one of these consequences, the forced growth of unnecessary federal bureaucracy, undermines the very constitutional objec-

·tives the Court's decision claims to serve. Cf. *Printz* v. *United States*, 521 U. S. 898, 959 (1997) (STEVENS, J., dissenting) ("In the name of State's rights, the majority would have the Federal Government create vast national bureaucracies to implement its policies"); *id.*, at 976–978 (BREYER, J., dissenting).

These consequences are not purely theoretical. The Court's decision may undermine enforcement against state employers of many laws designed to protect worker health and safety. See, *e. g.*, 42 U. S. C. § 7622 (1994 ed.) (Clean Air Act); 33 U. S. C. § 1367 (Clean Water Act); 15 U. S. C. § 2622 (Toxic Substances Control Act); 42 U. S. C. § 6971 (1994 ed.) (Solid Waste Disposal Act); see also *Rhode Island Dept. of Environmental Management* v. *United States*, 286 F. 3d 27, 36–40 (CA1 2002). And it may inhibit the development of federal fair, rapid, and efficient informal nonjudicial responses to complaints, for example, of improper medical care (involving state hospitals). Cf. generally Macchiaroli, Medical Malpractice Screening Panels: Proposed Model Legislation to Cure Judicial Ills, 58 Geo. Wash. L. Rev. 181 (1990).

\* \* \*

The Court's decision threatens to deny the Executive and Legislative Branches of Government the structural flexibility that the Constitution permits and which modern government demands. The Court derives from the abstract notion of state "dignity" a structural principle that limits the powers of both Congress and the President. Its reasoning rests almost exclusively upon the use of a formal analogy, which, as I have said, jumps ordinary separation-of-powers bounds. It places "great significance" upon the 18th-century absence of 20th-century administrative proceedings. See *ante*, at 755. And its conclusion draws little support from considerations of constitutional purpose or related consequence. In its readiness to rest a structural limitation on so little evidence and in its willingness to interpret that limitation so

broadly, the majority ignores a historical lesson, reflected in a constitutional understanding that the Court adopted long ago: An overly restrictive judicial interpretation of the Constitution's structural constraints (unlike its protections of certain basic liberties) will undermine the Constitution's own efforts to achieve its far more basic structural aim, the creation of a representative form of government capable of translating the people's will into effective public action.

This understanding, underlying constitutional interpretation since the New Deal, reflects the Constitution's demands for structural flexibility sufficient to adapt substantive laws and institutions to rapidly changing social, economic, and technological conditions. It reflects the comparative inability of the Judiciary to understand either those conditions or the need for new laws and new administrative forms they may create. It reflects the Framers' own aspiration to write a document that would "constitute" a democratic, liberty-protecting form of government that would endure through centuries of change. This understanding led the New Deal Court to reject overly restrictive formalistic interpretations of the Constitution's structural provisions, thereby permitting Congress to enact social and economic legislation that circumstances had led the public to demand. And it led that Court to find in the Constitution authorization for new forms of administration, including independent administrative agencies, with the legal authority flexibly to implement, *i. e.*, to "execute," through adjudication, through rulemaking, and in other ways, the legislation that Congress subsequently enacted. See, *e. g.*, *Yakus* v. *United States*, 321 U. S. 414 (1944); *Crowell* v. *Benson, supra*, at 45–47.

Where I believe the Court has departed from this basic understanding I have consistently dissented. See, *e. g.*, *Kimel* v. *Florida Bd. of Regents*, 528 U. S., at 92 (STEVENS, J., dissenting in part and concurring in part); *Alden* v. *Maine*, 527 U. S., at 760 (SOUTER, J., dissenting); *College Savings Bank* v. *Florida Prepaid Postsecondary Ed. Expense Bd.*,

527 U. S., at 693 (BREYER, J., dissenting); *Florida Prepaid Postsecondary Ed. Expense Bd.* v. *College Savings Bank,* 527 U. S. 627, 648 (1999) (STEVENS, J., dissenting); *Seminole Tribe of Fla.* v. *Florida,* 517 U. S., at 100 (SOUTER, J., dissenting).   These decisions set loose an interpretive principle that restricts far too severely the authority of the Federal Government to regulate innumerable relationships between State and citizen.   Just as this principle has no logical starting place, I fear that neither does it have any logical stopping point.

Today's decision reaffirms the need for continued dissent— unless the consequences of the Court's approach prove anodyne, as I hope, rather than randomly destructive, as I fear.