SCIRICA, Circuit Judge,
dissenting.
At issue is not whether some or all deportation hearings of special interest aliens should be closed, but who makes that determination. The answer depends on how we interpret the First Amendment of the Constitution.
The Constitution is silent on the right to public access. But the Supreme Court has framed a qualified right of access that may be overcome by sound reasons. Because no reason is more compelling than national security, closure of special interest alien deportation hearings may well be warranted.
The Supreme Court’s test in Richmond Newspapers — when a right of access attaches to a particular type of proceeding and whether it may be overcome-applies here. Therefore, I agree with the majority that this test applies to deportation hearings.[1] But I believe the requirements of that test are met. Consequently, I would find a qualified right of access to deportation hearings. Because I believe that Immigration Judges can make these determinations with substantial deference to national security, I would affirm the District Court’s judgment.[2]
*222 I. Experience
The Supreme Court has articulated a functional inquiry to determine whether “the place and process have historically been open to the press and general public.” Press-Enterprise Co. v. Superior Court, 478 U.S. 1, 8, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986) (“Press-Enterprise II”). Deportation hearings have a consistent history of openness. Congress first adopted immigration statutes at the end of the nineteenth century. In so doing, Congress expressly closed exclusion proceedings while leaving deportation hearings presumptively open. For at least one hundred years, deportation hearings have remained presumptively open to the public.
Department of Justice regulations, enacted in 1964, provide express approval for presumptively open hearings. See 8 C.F.R. § 242.16(a) (1964) (“All hearings, other than exclusion hearings, shall be open to the public except that ... [f]or the purpose of protecting ... the public interest, the Immigration Judge may limit attendance or hold a closed hearing.”). Although deportation hearings have been only presumptively open, Richmond Newspapers itself only recognizes a qualified right of access for criminal proceedings, which may be restricted by a countervailing public interest. Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 580-81, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980); see also Press-Enterprise II, 478 U.S. at 10, 106 S.Ct. 2735; Globe Newspaper v. Superior Court, 457 U.S. 596, 606-07, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982).[3]
The Supreme Court has noted that we must assess history “because a tradition of accessibility implies the favorable judgment of experience.” Press-Enterprise II, 478 U.S. at 8, 106 S.Ct. 2735 (internal quotation omitted); see also Globe Newspaper, 457 U.S. at 605, 102 S.Ct. 2613; Richmond Newspapers, 448 U.S. at 589, 100 S.Ct. 2814 (Brennan, J., concurring). But this historical assessment does not cabin our review only to proceedings with a pre-constitutional history of openness.[4] Other factors may reveal a favorable judgment of experience for presumptive access to deportation hearings.
Notably, Press-Enterprise II relies upon nineteenth and twentieth century history to find a tradition of openness for criminal preliminary hearings. 478 U.S. at 10, 106 S.Ct. 2735. In that case, the Supreme Court observed that “[t]he vast majority of States considering the issue have concluded that the same tradition of accessibility that applies to criminal trials applies to preliminary proceedings.” Id. at 10 n. 3, 106 S.Ct. 2735. These state court decisions confirmed the value of openness and the Supreme Court thus determined that “[ojpen preliminary hearings ... have been accorded the favorable judgment of experience.” Id. at 11, 106 S.Ct. 2735 (quoting Globe Newspaper, 457 U.S. at 605, 102 S.Ct. 2613).
Furthermore, the Supreme Court has recognized that the Founders “could not *223 have anticipated the vast growth of the administrative state.” Fed. Mar. Comm’n v. S.C. State Ports Auth., 535 U.S. 743, ——, 122 S.Ct. 1864, 1872, 152 L.Ed.2d 962 (2002). In South Carolina Ports Authority, the Court observed that “formalized administrative adjudications were all but unheard of in the late 18th century and early 19th century.” Id.[5] For administrative proceedings, therefore, it would appear that the experience inquiry should consider the tradition of access to a particular proceeding within the history of the modern administrative state.[6]
The Supreme Court also noted in South Carolina Ports Authority that some administrative adjudications share “numerous common features” with civil judicial proceedings, including an adversarial nature. Id. at 1872-73 (citing Butz v. Economou, 438 U.S. 478, 513, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978) (listing similarities between administrative and judicial proceedings)). Based upon these similarities, the Court in both South Carolina Ports Authority and Butz concluded that constitutional principles applicable to civil trials were relevant to the administrative proceedings at issue.[7] Deportation hearings share these common features. I agree with the majority, therefore, that “on a procedural level, deportation hearings and civil trials are practically indistinguishable.” Majority Op. at 215.[8]
That the historical tradition supports access to deportation hearings does not imply the existence of a qualified right of access for all administrative proceedings.[9] For example, Social Security benefits claim proceedings are distinguishable. They “are inquisitorial rather than adversarial,” in that the Administrative Law Judge undertakes multiple roles as the investigator, counselor, and adjudicator. Sims v. Apfel, 530 U.S. 103, 110-11, 120 S.Ct. 2080, 147 L.Ed.2d 80 (2000). The Supreme Court has identified the differences between Social Security claims and other administrative proceedings:
The differences between courts and agencies are nowhere more pronounced than, in Social Security proceedings. Although many agency systems of adjudication are based to a significant extent *224 on the judicial model of decisionmaking, the SSA is perhaps the best example of an agency that is not.
Id. at 110, 120 S.Ct. 2080 (internal quotations omitted).[10]
Congress has provided for presumptively open deportation proceedings from the moment that it first enacted an immigration statutory framework. This century of unbroken openness, especially within the nascent tradition of the administrative state, “implies the favorable judgment of experience” under the Richmond Newspapers test.
II. Logic
Public access to deportation hearings serves the same positive functions as does openness in criminal and civil trials. But the logic inquiry cannot consist merely of a recitation of the factors supporting open proceedings. “An assertion of the prerogative to gather information must ... be assayed by considering the information sought and the opposing interests invaded.” Richmond Newspapers, 448 U.S. at 588, 100 S.Ct. 2814 (Brennan, J., concurring); accord Majority Op. at 217 (“[T]he calculus must perforce take account of the flip side — the extent to which openness impairs the public good.”). I agree with the majority that the District Court erred in failing to consider the countervailing interest of national security.
The issue in this case is “whether the press and public have a First Amendment right to attend deportation hearings.” Majority Op. at 209. The logic analysis set forth by the Supreme Court is directed at a particular structural type of proceeding — in this case, deportation hearings— not a subset based on specific designations such as terrorism. In Globe Newspaper, the Court stated this point most clearly. Appellees in that case sought to limit the Richmond Newspapers analysis to rape trials. The dissent in Globe Newspaper cited evidence of “a long history of exclusion of the public from trials involving sexual assaults, particularly those against minors.” 457 U.S. at 614, 102 S.Ct. 2613. The Court rejected this suggestion, stating, “Whether the First Amendment right of access to criminal trials can be restricted in the context of any particular criminal trial, such as ... a rape trial, depends not on the historical openness of that type of criminal trial but rather on the state inter *225 ests assertedly supporting the restriction.” [11] Id. at 605 n. 13, 102 S.Ct. 2613.
At this stage, we must consider the value of openness in deportation hearings generally, not its benefits and detriments in “special interest” deportation hearings in particular. If a qualified right of access is found to attach to deportation hearings generally, the analysis then turns to whether particular issues raised in individual cases override the general limited right of access.
Were the logic analysis focused only on special interest cases, I would agree that national security would likely trump the arguments in favor of access. Although paramount in certain deportation cases— like terrorism — national security is not generally implicated in the panoply of deportation hearings that occur throughout the United States. There are many grounds for deportation — marriage fraud, moral turpitude convictions, and aggravated felonies, to name a few- — that do not ordinarily implicate national security.[12] See 8 U.S.C. § 1227(a).
Accordingly, the demands of national security under the logic prong of Richmond News-pwpers do not provide sufficient justification for rejecting a qualified right of access to deportation hearings in general. To conclude otherwise would permit concerns relevant only to a discrete class of cases to determine there is no qualified right of access to any of the broad range of deportation proceedings, a departure from Richmond Newspapers. Whether national security interests justify closure of individual deportation hearings is a question properly addressed in the next step’s more particularized inquiry.
III. Government Interests
Having found a qualified right of access to deportation hearings, the question remains whether the government has a sufficient justification to “override the qualified First Amendment right of access” by application of the Creppy Directive. Press-Enterprise II, 478 U.S. at 9, 106 S.Ct. 2735.
Where a qualified right of access has been found, courts ordinarily have required a substantial showing to deny access. “The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest.” Press-Enterprise I, 464 U.S. at 510, 104 S.Ct. 819. There must be “a substantial probability” that openness will interfere with these interests. Press-Enterprise II, 478 U.S. at 14, 106 S.Ct. 2735. Closure is appropriate only if “reasonable alterna *226 tives to closure” are not available to protect the government’s interests. Id. It bears noting, however, that these cases have not considered the deference due the government in matters involving national security.
The District Court found the Creppy Directive failed to pass muster under this test because, inter alia,[13] it was “not persuaded that the more narrow method of in camera disclosure of sensitive evidence ... is not an acceptable means of avoiding a compromise of the government’s investigation.” N. Jersey Media Group, Inc. v. Ashcroft, 205 F.Supp.2d 288, 302 (D.N.J.2002).
The government contends it is entitled to greater deference than is captured in this test because of two independent considerations. First, it contends it enjoys broad deference in the immigration area. And second, it argues the District Court erred in failing to afford it the special deference due the political branches in matters concerning national security.
The District Court undervalued the deference due the government in national security cases.[14] Id. at 301-02. Courts have consistently recognized the need for “heightened deference to the judgments of the political branches with respect to matters of national security” when “terrorism or other special circumstances” are at issue. Zadvydas, 533 U.S. at 696, 121 S.Ct. 2491. A “principle of judicial deference ... pervades the area of national security.” Franklin v. Massachusetts, 505 U.S. 788, 818, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992). Consequently, courts have not demanded that the government’s action be the one the court itself deems most appropriate in “cases involving discrete categories of governmental action in which there are special reasons to defer to the judgment of the political branches.” Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 570 n. 5, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993) (Souter, J., concurring); see also Rostker v. Goldberg, 453 U.S. 57, 70, 101 S.Ct. 2646, 69 L.Ed.2d 478 (1981).
On the other hand, deference is not a basis for abdicating our responsibilities under the First Amendment. Rostker, 453 U.S. at 67, 101 S.Ct. 2646; United States v. United States Dist. Court, 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972) (“domestic security” not a sufficient basis for relaxing warrant requirement; indepen *227 dent assessment of surveillance needs by magistrate generally required); New York Times Co. v. United States, 403 U.S. 713, 714, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971); United States v. Robel, 389 U.S. 258, 264, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967) (“Even the war power does not remove constitutional limitations safeguarding essential liberties.... Implicit in the term ‘national defense’ is the notion of defending those values and ideals which set this Nation apart.”) (internal quotation omitted). At issue is whether the Creppy Directive constitutes an impermissible restriction on the press and public’s right of access to deportation hearings. Moreover, there is no apparent reason to abandon the traditional framework for assessing the relative force of the government’s interests as against the right of access, so long as deference is afforded the judgments of the Executive Branch in these matters. Cf. Rostker, 453 U.S. at 70, 101 S.Ct. 2646 (“We do not think that the ... law will be advanced by any further ‘refinement’ in the applicable tests as suggested by the Government” to accommodate deference in military affairs.).
In this case, the government’s asserted interest — national security — is exceedingly compelling. Closure in some — or perhaps all — special interest cases may be necessary and appropriate. In fact, the Department of Justice regulations, enacted in 1964, expressly authorize an Immigration Judge to hold closed hearings to protect the public interest. But the question remains whether the Creppy Directive’s blanket closure rule — which removes the decision to close the hearing from the Immigration Judge on a case-by-case basis— is reasonably necessary for the protection of national security.
The government contends that a case-by-case closure of removal proceedings would permit the release of sensitive information, potentially revealing sources, patterns and methods of investigation. But there is no reason that all of the information related to a particular detainee cannot be kept from public view. Even the initial determination to close a proceeding — and to seal the entire record — can be accomplished in camera and under seal. The government need only make the required showing of special interest, under seal to the Immigration Judge, subject to appellate review. In making their determinations, Immigration Judges should grant substantial deference to national security interests. A similar procedural framework has proven workable with criminal prosecutions.[15]
The government maintains that these protections would be ineffective given the complexities in combating terrorism. It contends that individual, seemingly innocuous pieces of information, including a special interest alien’s name, could be harmful to national security when compiled by terrorists into a mosaic. This seems correct. Nevertheless, the government could make the same argument to an Immigration Judge, who could determine, with substantial deference, that the apparently innocu *228 ous information provides appropriate grounds for closure.
The Watson Declaration also expresses the fear that open deportation hearings could provide evidence to terrorists that certain border crossings offer a greater chance for illegal entry than others. At oral argument, government counsel offered an intriguing hypothetical where open hearings would reveal evidence that 0-of-30 terrorists had entered the United States successfully through Philadelphia, while the rate was 30-of-30 in New York City. Here too, however, the government could make this argument during a closed preliminary hearing at which the Immigration Judge, with appropriate deference to national security, could assess the government’s concerns about publicizing patterns of information.
The Creppy Directive and the pre-exist-ing Department of Justice regulations both accommodate the government’s national security responsibilities. But a case-by-case approach would permit an Immigration Judge to independently assess the balance of these fundamental values.[16] Because this is a reasonable alternative, the Creppy Directive’s blanket closure rule is constitutionally infirm.[17] As the Supreme Court reasoned in Globe Newspaper:
We emphasize that our holding is a narrow one: that a rule of mandatory closure ... is constitutionally infirm. In individual cases, and under appropriate circumstances, the First Amendment does not necessarily stand as a bar to the exclusion from the courtroom of the press and general public.... But a mandatory rule, requiring no particularized determinations in individual cases, is unconstitutional.
457 U.S. at 611 n. 27, 102 S.Ct. 2613.
The stakes are high. Cherished traditions of openness have come up against the vital and compelling imperatives of national security. Because I believe national security interests can be fully accommodated on a case-by-case basis, I would affirm that part of the District Court’s judgment.
IV. Nationwide Injunction
The final issue is whether the scope of the District Court’s nationwide injunction is overbroad. The grant of a permanent injunction is reviewed for abuse of discretion. Nutrasweet Co. v. Vit-Mar Enters., Inc., 176 F.3d 151, 153 (3d Cir.1999). I would hold that the District Court abused its discretion by issuing a nationwide injunction that bars enforcement of the Creppy Directive in any special interest proceeding and against any member of the general public or press. A narrower remedy will provide full relief to plaintiffs and allow other courts to explore this difficult constitutional question.
Generally, a plaintiff is only entitled to relief for itself. Ameron, Inc. v. U.S. Army Corps of Eng’rs, 787 F.2d 875, 888 (3d Cir.1986). In the First Amendment context, “although the occasional case requires us to entertain a facial challenge in order to vindicate a party’s right not to be bound by an unconstitutional statute, we neither want nor need to provide relief to *229 nonparties when a narrower remedy will fully protect the litigants.” United States v. Nat’l Treasury Employees Union, 513 U.S. 454, 477-78, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995) (citation omitted). In this case, injunctive relief should apply only to those parties actually before the court if that relief fully protects the litigants. See Ameron, 787 F.2d at 890.
Furthermore, where the government is involved in litigation, a court should not “thwart the development of important questions of law by freezing the first final decision rendered on a particular legal issue.” United States v. Mendoza, 464 U.S. 154, 160, 104 S.Ct. 568, 78 L.Ed.2d 379 (1984). Because constitutional proscriptions frequently challenge governmental action, different parties will likely assert the same constitutional claim against the government. Id. Where this happens, the Supreme Court has said that “[ajllowing only one final adjudication would deprive this Court of the benefit it receives from permitting several courts of appeals to explore a difficult question before this Court grants certiorari.” Id.
In this case, the only plaintiffs are North Jersey Media Group and New Jersey Law Journal. An injunction protecting these plaintiffs alone would remedy any violation of plaintiffs’ First Amendment rights. Enjoining enforcement of the Creppy Directive against other parties goes beyond providing relief to plaintiffs, and it deprives the Supreme Court of the opportunity to review the decisions of several courts of appeals. For these reasons, I would reverse the District Court’s nationwide injunction.

. Accordingly, I agree with much of parts I and II of the court’s learned opinion.

. At the same time, I would reverse the District Court's injunction as it applies nationwide. See Section IV, infra.

. While exceptions exist for deportation hearings involving abused alien children and spouses, criminal trials have similar exceptions (e.g., there is no public right of access to juvenile criminal proceedings).

. Our Court of Appeals has not framed a bright-line test for determining when a historical tradition is lengthy enough to satisfy Richmond Newspapers's experience prong. Our decisions suggest, however, that a more than one hundred year history of openness is sufficient to justify the conclusion that the experience prong has been satisfied. See, e.g., Whiteland Woods, L.P. v. Township of West Whiteland, 193 F.3d 177 (3d Cir.1999); United States v. Simone, 14 F.3d 833 (3d Cir.1994); United States v. Smith, 776 F.2d 1104 (3d Cir.1985); Publicker Indus., Inc. v. Cohen, 733 F.2d 1059 (3d Cir.1984).

. The Supreme Court has recognized that the “[m]ultiplication of federal administrative agencies and expansion of their functions to include adjudications which have serious impact on private rights [was] one of the dramatic legal developments of the [first half of the twentieth century]," Wong Yang Sung v. McGrath, 339 U.S. 33, 36-37, 70 S.Ct. 445, 94 L.Ed. 616 (1950).

. Congress crafted the system of deportation hearings during the early years of the modern administrative state. See 1 Richard J. Pierce, Jr., Administrative Law Treatise § 1.4, at 9 (4th ed.2002) (describing the historical' developments of administrative law); ■ Marian L. Smith, An Overview of INS History, in A Historical Guide to the U.S. Government 305, 305 (George Thomas Rurian ed., 1998) (detailing how the United States did not begin to question its policy of “free and open immigration” until the late 1800s). Since then, deportation hearings have remained presumptively open.

. I - agree with the majority that the South Carolina Ports Authority holding may not extend "the full panoply of constitutional rights ■ to any administrative proceeding that resembles a civil trial.” Majority Op. at 215. The Supreme Court left this question for another day. But its comparison of administrative proceedings to civil trials remains instructive.

. On this level, a deportation hearing "walks, talks, and squawks like a civil lawsuit.” South Carolina Ports Authority, 535 U.S. at -, 122 S.Ct. at 1873 (internal quotation omitted).

. As the Supreme Court has noted, there is a distinction between liberty and property interests in administrative hearings. Wong Yang Sung, 339 U.S. at 50-51, 70 S.Ct. 445.

. Deportation hearings are adversarial proceedings that share many of the features common to civil judicial proceedings that the Supreme Court enunciated in South Carolina Ports Authority:
Federal administrative law requires that agency adjudication contain many of the same safeguards as are available in the judicial process. The proceedings are adversary in nature. They are conducted before a trier of fact insulated from political influence. A party is entitled to present his case by oral or documentary evidence, and the transcript of testimony and exhibits together with the pleadings constitutes the exclusive record for decision. The parties are entitled to know the findings and conclusions on all of the issues of fact, law, or discretion presented on the record.
South Carolina Ports Authority, 535 U.S. at -, 122 S.Ct. at 1873 (quoting Butz, 438 U.S. at 513, 98 S.Ct. 2894).
The Supreme Court has held that deportation hearings require a heightened standard of proof, suggesting their unique position within the context of administrative proceedings. Woodby v. INS, 385 U.S. 276, 286, 87 S.Ct. 483, 17 L.Ed.2d 362 (1966) (requiring clear, unequivocal, and convincing evidence to support the grounds for deportation). Conversely, many of the other administrative proceedings cited by the government do not share as many of the South Carolina Ports Authority common factors, and they may contain other features — the protection of privacy, reputation, and medical information' — that counsel against access.

. Courts have consistently applied Richmond Newspapers in this way. See, e.g., Press-Enterprise II, 478 U.S. at 9, 106 S.Ct. 2735 (preliminary hearings); Press-Enterprise Co. v. Superior Court, 464 U.S. 501, 508, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984) ("Press-Enterprise I”) (criminal trial voir dire); Richmond Newspapers, 448 U.S. at 580, 100 S.Ct. 2814 (criminal trials); Detroit Free Press v. Ashcroft, 303 F.3d 681, 2002 WL 1972919 (6th Cir.2002) (detention hearings); First Amendment Coalition, 784 F.2d at 473 (judicial review proceedings); Smith, 776 F.2d at 1112 (bills of particular); Publicker, 733 F.2d at 1069-70 (civil trials).

. National security presents similar challenges in some criminal prosecutions. See 50 U.S.C. § 1801 et seq. (authorizing the Foreign Intelligence Surveillance Court to issue search warrants in closed proceedings to protect national security). But national security interests have not been sufficient to reject a qualified right of access to criminal trials in general. Instead, if access can be limited, it is because "national security concerns about confidentiality may sometimes warrant closures” as a "countervailing interest[] ... sufficiently compelling to reverse this presumption of openness.” Richmond Newspapers, 448 U.S. at 598 & n. 24, 100 S.Ct. 2814 (Brennan, J., concurring).

. The District Court also found the Creppy Directive inadequate to the extent it is not fully effective at blocking public access to sensitive information, since the information might become public by any of several other means. N. Jersey Media Group, 205 F.Supp.2d at 301. In my view, the government’s rejoinder effectively disposes of this finding.

. Courts also must acknowledge the "immigration-related expertise of the Executive Branch,” and afford its judgments an appropriate level of deference. Zadvydas v. Davis, 533 U.S. 678, 700, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001). As the District Court acknowledges, the government has traditionally enjoyed near-plenary power to determine the substance of immigration law. Reno v. Flores, 507 U.S. 292, 305, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993); Yamataya v. Fisher, 189 U.S. 86, 100-101, 23 S.Ct. 611, 47 L.Ed. 721 (1903). But the courts have been less likely to defer to the government on procedural issues where constitutional rights may be affected. Zadvydas, 533 U.S. at 695, 121 S.Ct. 2491; INS v. Chadha, 462 U.S. 919, 941-42, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983). Even in this area, however, the Executive Branch is entitled to a measure of deference given its primaiy responsibility over immigration matters. Administrative law principles "counsel judges to give expert agencies decisionmaking leeway in matters that invoke their expertise.” Zadvydas, 533 U.S. at 700, 121 S.Ct. 2491. Therefore, executive decisions in this area should be accorded a special degree of deference.

. The Classified Information Procedures Act provides for pretrial conferences and motion hearings to determine limits on the use and disclosure of classified and national security related information in criminal prosecutions. 18 U.S.C.App. 3 §§ 2-4, 6, 8. These proceedings may be held in camera and, in certain circumstances, ex parte. Id. §§ 2-4, 6; United States v. Klimavicius-Viloria, 144 F.3d 1249, 1260-61 (9th Cir.1998). Congress also has created the Foreign Intelligence Surveillance Court to hold closed reviews of search warrant requests on a case-by-case basis, rejecting a framework where the Department of Justice makes its own judgments on these matters in national security cases. 50 U.S.C. § 1801 et seq.

. As noted, the Department of Justice regulations permit an Immigration Judge to close deportation hearings in their entirety in order to protect the public interest. This closure is broader in scope than what is likely to occur in criminal prosecutions because immigration proceedings call for greater deference to the government on matters of national security.

. As noted, the Supreme Court held in Press-Enterprise II that a restriction on a qualified right of access fails if there are "reasonable alternatives to closure.” 478 U.S. at 14, 106 S.Ct. 2735.