OPINION AND ORDER
GARY P. SULLIVAN, Chief Justice.
BRIEF FACTUAL OVERVIEW AND PROCEDURAL HISTORY
Various officers of the appellant filed three separate Petitions for Order to Restrain on April 24, 2000, requesting that the Fort Peck Tribal Court restrain various City, County, State and Tribal officials from ‘entering into any and all Cooperative Agreements that would provide Cross De-putization of Law Enforcement Officers on the Fort Peek Assiniboine and Sioux Indian Reservation’ based upon allegations that such agreement(s) were scheduled to be signed at 11:00 a.m. on April 26, 2000, and further, that such agreement(s), if entered into, would subject Tribal members and other Indian persons to the jurisdiction of non-Indian law enforcement entities. Appellants concluded that such subjection would “affect the individual civil rights and treaty rights” of all Indians within the boundaries of the Fort Peck Tribes. All three petitions were filed with the Tribal Court without proof of service on any of the adverse parties.
The Tribal Court denied the petitions based upon Title VIII CCOJ 2000 § 401(a) [1] which prohibits the Court from issuing Temporary Restraining Orders or any injunction against the Tribes, or one of their officials acting on behalf of the Tribes, without prior notice. The Tribal Court also based its denials upon a failure of appellants to show “specific facts ... by oral testimony, affidavit, or by verified complaint that immediate and irreparable injury will result” in that “(a)ll Indians who reside on the Fort Peck Indian Reservation are already subject to the arrest by non-tribal law enforcement officers in certain situations”. We assumed the Tribal Court was making reference to Title III CCOJ 2000 § 208[2] which clearly authorizes *294 the -Tribal Executive Board to grant to “all law enforcement officials vested with general law enforcement authority by the State of Montana, or by any County or City within the boundaries of the Fort Peck Reservation ...” to arrest Indians within the exterior boundaries of the Fort Peck Reservation under certain conditions.
In its petitions, appellant alleges, “There is no foundation in fact or law enacted by treaty, constitutional provision or otherwise which authorizes the Defendants to subject tribal members or other Indian persons, residing within the exterior boundaries of the Fort Peck Indian Reservation, to the jurisdiction of non-Indian law enforcement entities”. Appellant petitioned this Court and in Fort. Peck Sioux General Council v. Fort Peck Tribes, FPCOA # 350, 2000 WL 35716899, 2 Am. Tribal Law 194 (2000) we observed: “It must be assumed that appellants are either unaware of § 208 or they are, by implication, challenging its constitutionality. If appellants were to formally challenge the constitutionality of § 208, they must do so with a great deal more precision. While such a challenge would afford them the opportunity to be heard, it should be noted that any preliminary injunction pending the outcome of the challenge must meet the standard set forth in § 402[3], which is essentially the same standard set forth in § 401(a)”.
In # 350 we upheld the Tribal Court denials noting after a careful reading of all three petitions “that appellants were not requesting Temporary Restraining Orders, but rather, permanent restraining orders”. However, the fact that appellants filed their petitions, giving the Tribal Court only two days to act before the actions sought to be restrained were to take place, coupled with the fact that the Petitions were filed without proof of notice to the opposing parties, easily gives the impression that appellants were asking the Tribal Court to act without conducting a hearing. Such action would have been in violation of § 401(a), cited above.
Following the denial of their petitions in # 350, appellants filed a complaint on April 25, 2000, seeking declaratory relief, challenging the constitutionality of § 208 and moving for a preliminary injunction and emergency hearing[4]. On April 26, *295 2000, the Tribal Court, without comment, denied appellants’ motion for injunctive relief. In Fort Peck Sioux General Council v. Fort Peck Tribes, FPCOA # 354, 2000 WL 35716987, 2 Am. Tribal Law 196 (2000) we held that injunctive relief was governed by § 402 and inasmuch as the Tribal Court denied appellants’ motion without comment, it was impossible for this Court to review? the denial for error. We then remanded the matter to the Tribal Court with instructions to either: 1) Set a hearing date for the preliminary injunction and issue its findings and order thereafter, or, alternatively, 2) Issue an order without granting a hearing, setting forth in the order the legal basis and rationale for the Court’s order.
On March 14, 2001, the Tribal Court heard appellants’ petition for preliminary injunction, motion to appoint Special Judge and appellee’s motion to dismiss. In dismissing appellant’s action, the Tribal Court cited Title II CCOJ 2000 § 110 as controlling. § 110 states: “The Tribes shall be immune from suit. Nothing in the Code shall be construed as consent of the Tribes to be sued.” The Tribal Court also cited a number of federal cases as well as this Court’s Reddoor v, Wetsit, FPCOA # 095 (1990) in support of its denial. We granted appellants’ petition for review on May 9, 2001, limiting our review to the singular issue “Whether the -Fort Peek Tribes enjoy sovereign immunity when a provision of the Tribal Code is challenged as unconstitutional.” We heard oral argument on November 2, 2001, and the matter was submitted.
STANDARD OF REVIEW
Whether the Fort Peck Tribes enjoy sovereign immunity is a question of law which we review de novo. Title II CCOJ 2000 § 202.
DISCUSSION
At the heart of the issue before us is whether the plain language of § 110 bars a suit against the Tribes even when the constitutionality of their actions is questioned. In DeCoteau v. Fort Peck Tribes, FPCOA # 363 (2003), we recently held that § 110 barred suits against the Tribes under 25 U.S.C. § 1302, nothing that the Tribes provided a remedial avenue of redress for such grievances under Title II CCOJ 2000 § 111. We also noted that in Title II CCOJ 2000 § 11-[5] the Tribes expressly waived their immunity for judicial review of certain administrative decisions. *296 However, neither § 111 nor § 113 address the issue before us.
Appellants argue that the purpose of sovereign immunity is to protect the entire membership, as a whole, rather than a few selected individuals elected to office, and when the “constitutional and civil rights” have been violated there must be available to them a forum for redress. Appellants maintain that the intent of § 1302 is to protect tribal members and others within Indian Country from the abuse of power by Tribal Governments and that “(t)o say that the Tribes and its elected officials cannot be sued creates chaos, discontent (and) an atmosphere ripe for abuse of power and authority ... creat(ing) a class of individuals that become simply ... above the law.” (See Appellants’ Notice of Intent and Supportive Statement filed May 29, 2001, at page 2.) We addressed and resolved most of appellants’ concerns in De-Coteau. However, the specific issue of whether the Tribes enjoy sovereign immunity when one or more of its duly enacted code provisions are attacked as unconstitutional is an issue of first impression in this Court[6].
The Tribes argue that the Tribal Court’s dismissal should be affirmed by this Court “because this case does not present a plausible claim that the Tribes’ constitution has been violated”. The Tribal Court did not address whether, as a matter of law, appellant presented a plausible claim or whether § 208 was unconstitutional. We limited review in this matter to the issue of sovereign immunity because it was the only issue ruled upon by the Tribal Court.
The Tribes also argue, “in any event (the Tribes) are immune from a suit challenging the constitutionality of a tribal code provision”. The Tribes cite § 110 as the controlling authority. In addition to $ 110, the Tribes-cite Reddoor, supra, in support of its position. In Reddoor we held that the Election Commission’s execution of its duties pursuant to Title XIV CCOJ § 111(1) (now Title V CCOJ 2000 § lll(i)) was not subject to judicial review. Stated simply, the primary issue resolved in Reddoor was to keep the Tribal Court out of the business of deciding election contests, thus we find no support in Reddoor for appellee’s argument here. Before examining § 110, we turn to the federal cases cited by the Tribes.
The Tribes cite a line of federal cases headed by the landmark decision in Santa Clara Pueblo v. Martinez, 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978) holding that Tribal Governments enjoy sovereign immunity in the absence of an express consent to be sued or an express waiver by the U.S. Congress. We dealt extensively with this issue in DeCoteau, stating:
“However, we need go no further than Santa Clara Pueblo to determine whether Indian Tribes and their elected officials, employees and agents, enjoy sovereign immunity from civil suits pursuant to ICRA. With the exception of habeas corpus, which is not in issue here, the answer with reference to federal courts is in the affirmative and as to Tribal Courts it is in the negative. In short, we believe that federal common law prohibits federal court jurisdiction for civil suits against Indian Tribes and their officials, employees and agents, while encouraging and designating the tribal courts as the most appropriate forum for lawsuits under ICRA.” (DeCo-teau at pages 5-6)
*297 We note that not all suits attacking the constitutionality of a code provision necessarily fall within the purview of § 1302. Nonetheless, the Tribes have not cited, nor are we aware of, any controlling federal case which holds that an Indian government enjoys sovereign immunity in a Tribal Court when one of its laws are attacked as unconstitutional. On the contrary, we believe a strong argument can be made that federal courts take the opposite view. In addressing the issue with respect to ICRA, the U.S. Supreme Court in Santa Clara Pueblo observed:
“Tribal forums are available to vindicate rights created by the ICRA, and § 1302 has the substantial and intended effect of changing the law which these forums are obliged to apply[7]" (436 U.S. at 65, 98 S.Ct. 1670, 56 L.Ed.2d 106) (Our emphasis)
Regarding tribal sovereign immunity and federal case law, we restate our holding in DeCoteau here: The Fort Peck Tribes and their officers, employees and agents enjoy sovereign immunity in the federal courts. As to jurisdiction of our Tribal Court, officers, employees and agents of the Fort Peck Tribes enjoy limited sovereign immunity pursuant to § 111 and, subject to the consensual review of certain administrative decisions pursuant to § 113, the Fort Peck Tribes enjoy sovereign immunity.
The plain language in § 110. In DeCo-teau we stated that the language of § 110 was “straight forward and definite ... (and)(a)s such, ... needs no interpretation from this Court”. We agree with the Tribes that “(t)he section is absolute” and that “it does not say ‘except if a constitutional violation is claimed’ Nonetheless, the case sub-judice presents such an important and sensitive question of law we would be remiss to leave the matter without a thorough examination of the purpose and benefits of sovereign immunity; the potential adverse consequences of a government that enjoys “absolute sovereign immunity” and this Court’s duty and role in determining the law.
Purpose of sovereign immunity. The doctrine of sovereign immunity finds its genesis in the basic root of English common law. Its initial underpinnings were based on adages such as, ‘“the sovereign can do no wrong’ ” or “the law giver cannot be made subject to a lawsuit”. Far more compelling rationales are advanced today: “Preeminent purpose of state sovereign immunity is to accord States the dignity that is consistent with their status as sovereign entities.” Federal Maritime Com’n v. South Carolina State Ports Authority, 535 U.S. 743, 122 S.Ct. 1864,1874, 152 L.Ed.2d 962 (2002); “The rationale for sovereign immunity essentially boils down to substantial bothersome interference with the operation of government.” Littell v. Morton 445 F.2d 1207 (4th Cir.1971). In their excellent brief the Fort Peck Tribes offer compelling rationale for tribal sovereign immunity: “Sovereign immunity protects tribes against unconsented lawsuits *298 that would drain tribal treasuries, inter* fere with tribal government operations, and handicap the tribe’s ability to provide much-needed services to its people”, (id. at page —-)
We are in total agreement. There is no doubt that the doctrine of sovereign immunity is the singular most important issue facing all Indian governments today.
Benefits of sovereign immunity. As applied to Tribal governments, the summary of cited rationales, supra, provide an array of benefits that accrue from sovereign immunity. Tribes are afforded the dignity consistent with sovereign entities; they are protected from unconsented lawsuits which drain their treasuries, interfere with daily governmental operations and handicap their ability to. provide-necessary services to their people. In short, sovereign immunity allows tribal governments to take their limited resources and run a more efficient, effective and productive entity; all of which ultimately inures to the benefit of its people. Recognizing the great need for services on Indian Reservations there should be no one unmindful of the importance of sovereign immunity, without which Tribal governments would be severely handicapped if not incapacitated.
Thus, when the invocation of sovereign immunity advances the benefits of its purpose and rationale we will continue to strongly support the doctrine. Further, it is our belief that our Tribal Council enacted § 110 with these benefits in full view. However, we also believe that our Tribal Council did not contemplate any adverse effects that might be visited upon its people by virtue of the doctrine.
Adverse effects of “absolute” sovereign immunity. Sovereign immunity presupposes that the government, their agencies, and/or officers acting thereunder, do so within the scope of their duties. In other words, sovereign immunity does not shield wrongdoing. As an example, who stands for the proposition that tribal governments can take property from its members or others within their jurisdiction in violation of its constitution or without statutory authority? Who supports a government that enacts laws contrary to the will of the people as expressed in its constitution? Who then will advocate the notion that it is fair and just for one to have a right but their only remedy is barred by sovereign immunity? In 1803 Chief Justice Marshall posed a similar question:
“If he has a right, and that right has been violated, do the laws of his country afford him a remedy? The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury. One of the first duties of government is to afford that protection. In Great Britain the king himself is sued in the respectful form of a petition, and he never fails to comply with the judgment of his court.” Marbury v. Madison, 5 U.S. 137, 162-163, 1 Cranch 137, 2 L.Ed. 60 (1803)
The authority given to those fine people who we elect and appoint to powerful positions understand that their authority is not vested by divine right, but rather, it is the people who elected or appointed them and it is that same electorate who created this government with a constitution granting limited power to their leaders and it is within that framework, and that framework only, they have consented to be governed.
Thus, we come to the critical question before us: Does the defense of sovereign immunity advance its purposes and rationale when invoked against a claim that challenges the constitutionality of a provision in the Comprehensive Code of *299 Justice (2000)? We think not. We see no benefit flowing from sovereign immunity when it does nothing more than shield an inquiry into whether a provision of existing law passes constitutional muster. Such invocation does nothing more than take a doctrine intended for the people’s protection and use it as a weapon of deprivation. Neither our Tribal Council nor this Court can condone such misuse. We are confident that our Tribal Council shares our belief that a government can only be as strong as its will to treat its people righteously.
Thus, we hold that § 110 does not bar claims against the Fort Peek Tribes when one of the provisions of the CCOJ 2000 is challenged as unconstitutional.
Duty of the Fort Peck Tribal Court system. We are acutely aware of those who will question this Court’s authority in this matter. However, we do not see it as a matter of authority, but rather, as a matter of duty.
The Fort Peck Tribes is a constitutional government, created by the people of the Assiniboine and Sioux Nation. The original creative will of the people is expressed in a written constitution that in turn authorizes our Tribal Council to organize and assign responsibilities and duties to various branches of government. These powers and responsibilities are defined and therefore limited. If so limited, the question arises: What happens if the limited power and authority thus given is transcended? And, who will decide such an occurrence? To answer the first question we turn again to Chief Justice Marshall:
“The question, whether an act, repugnant to the constitution, can become the law of the land, is a question deeply interesting to the United States; but, happily, not of an intricacy proportioned to its interest. It seems only necessary to recognize certain principles, supposed to have been long and well established, to decide it.”
(After a discussion of limited and “illim-ited” governments and holding that the United States was a limited government, he continues ...)
“... If an aet of the legislature, repugnant to the constitution, is void, does it, notwithstanding its invalidity, bind the courts and oblige them to give it effect? Or, in other words, though it be not law, does it constitute a rule as operative as if it was a law? This would be to overthrow in fact what was established in theory; and would seem, at first view, an absurdity too gross to be insisted on. It shall, however, receive a more attentive consideration.” (Marbury at 5 U.S. 177, 1 Cranch 137)
Chief Justice Marshall goes on to answer the second question of “-who” will decide:
“It is emphatically the province and duty of the judicial department to say what the law is. Those who apply the rule to particular cases, must of necessity expound and interpret that rule. If two law's conflict with each other, the courts must decide on the operation of each.”
“So if a law be in opposition to the constitution: if both the law and the constitution apply to a particular case, so that the court must either decide that case conformably to the law, disregarding the constitution; or conformably to the constitution, disregarding the law: the court must determine which of these conflicting rules governs the case. This is of the very essence of judicial duty.” (Marbury at 177-178, 1 Crunch 137, 2 L.Ed. 60)
The Marbury decision has been referred to as “the fount ainhead of Aman- *300 can jurisprudence[8]’ and for 200 years it has formed the foundation of judicial review. The doctrine is well entrenched in the federal courts as well as all state jurisdictions. Many notable tribes have also adopted the doctrine in Indian Country. (Halona v. MacDonald, 1 Nav. R. 189, 204-206 (1978)) (held: Actions of Navajo Tribal Council reviewable by Tribal Court); Satiacum v. Sterud, No. 82-1157 [Puyallup 04/23/1982] (held: Actions of Puyallup Tribal Council reviewable by Tribal Court); Hunter v. Holder, 1991 WL 733409, 2 Okla. Trib. 187 (Delaware CIO, 1991) (held: Election Board acted ultra vires, “stripped” of sovereign immunity); Apache Election Bd. v. Wildes, 1990 WL 655885, 2 Okla. Trib. 136 (Apache. CIA,1990) (held: Election Board did not enjoy sovereign immunity when their actions are unconstitutional).
The primary and sole function of our Tribal Court system is to define and interpret the law of this land and to insure that the rights and privileges of those who come before it are properly preserved. We do not seek to intermeddle or obfuscate the operations of our legislative and executive officers, nor do we seek to “second guess” their decision making process. We are in total agreement with Chief Justice Marshall’s comment on judicial usurpation:
“It is scarcely necessary for the court to disclaim all pretensions to such a jurisdiction. An extravagance, so absurd and excessive, could not have been entertained for a moment. The province of the court is, solely, to decide on the rights of individuals, not to inquire how the executive, or executive officers, perform duties in which they have a discretion. Questions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court.” (Marbury at 170, 1 Cranch 137, 2 L Ed. 60.)
Yet, we are not unmindful that our actions herein have looked squarely into the face of plain, simple and straightforward words of our Tribal Council and we have set them aside in a singular, narrow instance. We have not done so lightly. The law and the intent of our Tribal Council has ever been our guide. However, to say that we do not believe our Tribal Council intended the result of their plain words would be absurdly presumptuous. Nonetheless, we have a 43-year history of Tribal Council actions from which to draw and a review of those actions shows no evidence of their desire to deprive their people of any rightful and proper redress. As to the present opposition to appellant’s claim it must be noted that all governments seek to vindicate existing laws, allowing the courts of the land to determine what is and what is not constitutionally repugnant. And, that is precisely the process we have undertaken herein.
IT IS NOW THEREFOR THE ORDER OF THIS COURT THAT:
The matter is remanded to the Tribal Court for further proceedings consistent with the opinion herein.
CONCUR: GERARD M. SCHUSTER, Associate Justice.

. Title VIII CCOJ § 401(a) (formerly Title IV § 401(a)) reads:
Sec. 401. Temporary restraining orders without notice.
(a) No temporary restraining order or other injunction without notice shall be granted where the Tribe is a defendant or a tribal official is a defendant in his/her official capacity. Otherwise, except as provided in subsection (c), no temporary restraining order shall be granted without notice to the adverse party unless it clearly appears from specific facts shown by oral testimony, affidavit or by the verified complaint that immediate and irreparable injury will result to the applicant before notice can be served and a hearing had thereon

. Title III CCOJ 2000 § 208 states:
Sec. 208. State and local law enforcement officials authorized to make arrests.
*294 (a) All law enforcement officials vested with general law enforcement authority by the State of Montana, or by any County or City within the boundaries of the Fort Peck Reservation and approved by Executive Board on recommendation of the safety committee, are hereby authorized to arrest Indians on any highway on the Reservation or within the boundaries of the cities of the Reservation for violations of the Tribal Code of Justice. Each jurisdiction shall from time to time submit the names of new law enforcement officials to the safety committee for approval.
(b) Upon arresting any Indian as authorized by this Section, such law enforcement officials shall promptly deliver the individual to the Tribal Court or to the appropriate tribal law enforcement officers for action under tribal laws.

. Title VIII CCOJ § 402 states:
Sec. 402. Preliminary injunctions. A preliminary injunction restrains activities of a defendant until the case can be determined on the merits. No preliminary injunction shall be issued without notice to the adverse party and an opportunity to be heard, and no preliminary injunction shall be issued absent clear and convincing proof by specific evidence that the applicant will suffer irreparable harm during the pendency of the litigation unless a preliminary injunction is issued, that the applicant has a high likelihood of success on the merits, and that the balance of equities favors the applicant over the party sought to be enjoined. The Court may dissolve or modify a preliminary injunction at any time as the interests of justice require.

. The Tribal Executive Board was to enter into an agreement with various Montana State, County and City officials which would, for the first time in the history of the Fort Peck Reservation, grant full reciprocity to the *295 Tribes in terms of arrest authority. The ceremonial signing of that agreement was to take place on April 26, 2000.

. Sec. 113. Review of administrative decisions.
(a) The Court shall have exclusive jurisdiction over all appeal from actions bv agencies or offices of the Tribes, where such appeals are authorized by this Code.
(b) Notwithstanding Section 110 of this Title, the Tribes hereby waive their immunity front suit in Tribal Court for appeals under subsection (a). Relief against the Tribes shall be limited to that specified in the provisions of the Code authorizing the appeal. In no event shall the Tribes be liable for money damages, except that the Tribal Court may order refunds of taxes or fees erroneously collected where such relief is specifically authorized by the provision of the Code under which the appeal is taken. Sec. 502. Issuance of subpoenas. (a) Upon request of the defendant or upon the Court’s own initiative, the Court shall issue subpoenas to compel the testimony of witnesses, or the production of books, records, documents or any other physical evidence relevant to the determination ol the case and not an undue burden on the person possessing the evidence. An employee of the Court may act on behalf of the Court and issue subpoenas which have been signed by a trial judge and which are to be served within the confines of the Reservation.

. The fact that appellants’ complaint marks the first time in the 43 year history of our Constitution that one of its provisions was challenged as unconstitutional is a tribute to the document itself as well as those past and present leaders who have faithfully carried out its provisions with excellence.

. The quoted portion of the text makes reference to 20 which reads:
FN20. Prior to passage of the ICRA, Congress made detailed inquiries into the extent to which tribal constitutions incorporated Bill of Rights guarantees, and the degree to which the tribal provisions differed from those found in the Constitution. See, e.g., 1961 Hearings 121, 166, 359; Hearings before the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary pursuant to S.Res.58, 88th Cong., 1st Sess., 823 (1963). Both Senator Ervin, the ICRA's chief sponsor, and President Johnson, in urging passage of the Act, explained the need for Title I on the ground that few tribal constitutions included provisions of the Bill of Rights. See House Hearings 131 (remarks of Sen. Ervin);. 114 Cong. Rec. 5520 (1968) (message from the President).

, Attributed to U.S. Supreme Court Justice Antonin Scalia