NOONAN, Circuit Judge:
The State of Alaska, Office of the Governor (the Governor’s Office) appeals the remand order of the United States Equal Employment Opportunity Commission (the EEOC) in a suit against the State of Alaska brought by two discharged members of the Governor’s Office. We hold that the suit is barred by the Eleventh Amendment and direct its dismissal.
FACTS AND PROCEEDINGS
In the election of November 1990, Governor Walter Hickel ran for reelection with Jack Coghill as his running mate for Lieutenant-Governor. Hickel and Coghill were elected. In a gesture to his ideologically-different running mate, Hickel appointed Margaret Ward (Ward) to be Director of the Office of the Governor in Anchorage and appointed Lydia Jones (Jones) to be one of his Special Staff Assistants in the same office. Both positions were exempt from civil service. Ward’s responsibilities as set out by her included supervision of “all operations of Governor’s Anchorage Regional Office, including personnel. Promote the goals and agenda of Governor Hickel and his administration.” Jones’ responsibilities, as set out in a staff description of the position, included response to the voluminous correspondence addressed to the governor and the handling of 350 to 450 telephone calls per day. The Special Assistants were expected to give “a friendly ear or helping hand for a constituent” and to be advocates of the governor’s programs in the legislature or with the public. The job description concluded: “It is a position of political sensitivity demanding ever-changing priorities and the flexibility to handle almost any type of problem.”
During his term of office, Lieutenant-Governor Coghill took steps to be able to run for governor in the 1994 election. By midsummer 1993, Ward was believed to be assisting his forthcoming campaign. The Governor’s Office suspected that Jones was assisting her. As a consequence of these suspicions, the Chief of Staff of the Governor’s Office directed the Director of Administrative Services to issue a memorandum to all senior staff in the Governor’s Office. Issued on September 23, 1993, the memo advised the senior staff of the legal limits on any campaign activities by them. On February 10, 1994, Ward received a warning against continuing her rumored campaign conduct. The next day, February 11, 1994, Ward reported to the Governor’s Office that Jones was complaining about sexual harassment. On February 15,1994, the Governor’s Office ordered an investigation. On March 11, 1994, Ward and Jones held a press conference in which they criticized Governor Hickel. They were at once placed on administrative leave. On April 22, 1994, when the Governor’s Office investigation was completed, their employment was terminated because of their alleged election activities.
On April 25, 1994, the Governor’s Office was served with complaints to the EEOC *478 by Jones and Ward. Jones’ complaint alleged that she had suffered sexual harassment by a male Special Staff Assistant and that she had been paid less than her male counterparts because of her gender and her race (black). Ward alleged that she had suffered sex discrimination and retaliatory discrimination. Filed as charges under Title VII of the Civil Rights Act, the charges were classified by the EEOC as falling under the Government Employee Rights Act (GERA). The case lay dormant until January 15, 2003.
Before the EEOC reopened the case, Jones died. Her widower, Kenneth Miller, alleged that he stepped into her shoes. The Governor’s Office, pleading immunity under the Eleventh Amendment and assorted other defenses, moved for summary judgment. On January 4, 2005, an Administrative Law Judge denied summary judgment on the other defenses, but doubted if he had jurisdiction to rule on immunity under the Eleventh Amendment and so made no ruling on this defense, certifying it to the EEOC itself. On December 14, 2006, the EEOC ruled that “an agency will not rule on the constitutionality of a statute that it is assigned to administer.” The EEOC remanded the case to the ALJ.
The Governor’s Office appeals.
ANALYSIS
Ordinarily we do not have jurisdiction to review an order that is not final. Such is the EEOC’s order of remand. But there are exceptions, and this case is one. See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 141, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993) (holding that an order denying a State’s claim to Eleventh Amendment immunity is an appealable collateral order). We proceed to examine the merits of the immunity asserted by the Governor’s Office.
Amendment XI to the Constitution of the United States, adopted in 1798, reads: “The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.” Amost a century later the Supreme Court of the United States expanded the extent of the immunity conferred on the States by adding citizens of the same State to the category of potential plaintiffs disabled from pursuing a remedy for a wrong alleged to have been committed by the State. Hans v. Louisiana, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890).
The Eleventh Amendment textually poses no barrier to a suit by the United States or an agency of the United States against a State. But in 2002, it was held that the immunity of a State “extends beyond the literal text of the Eleventh Amendment.” Fed. Mar. Comm’n v. South Carolina State Ports Auth., 535 U.S. 743, 754, 122 S.Ct. 1864, 152 L.Ed.2d 962 (2002). The Supreme Court remarked that “we cannot imagine” that the Framers would have found it acceptable to compel a State to answer the complaints of private parties that were channeled through a federal agency. Id. at 760, 122 S.Ct. 1864. The dignity of a State would be compromised. Id. The EEOC is in no better position than the Federal Maritime Commission when it presents the complaint of two private persons.
Amendment XIV, however, imposes obligations on the States. Section 5 of the amendment provides: “The Congress shall have the power to enforce, by appropriate legislation, the provisions of this article.” The Fourteenth thus trumps the Eleventh if Congress legislates to enforce the Fourteenth and the legislation is appropriate. The Supreme Court has set *479 criteria for legislation to meet if the Supreme Court is to judge the legislation appropriate. The Court requires that Congress has “unequivocally expressed its intent to abrogate that immunity” and “acted pursuant to a valid grant of constitutional authority.” Kimel v. Fla. Bd. of Regents, 528 U.S. 62, 73, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000).
In 1972, Congress held extensive hearings on discrimination in the treatment of the ten million or more employees of state and local governments. On the basis of these hearings, the relevant committees found extensive gender and racial discrimination by the States. See H.R.Rep. No. 92-238 (1971), reprinted in 1972 U.S.C.C.A.N. 2137, and S.Rep. No. 92-415 (1971). The reported instances of discrimination appeared to be across the board. No special mention, one way or the other, was made of highly-placed employees serving in posts close to the governor of a State. As enacted in 1972, the Equal Employment Opportunity Act based on the hearings excluded from its protection elected officers and “any person chosen by such officer to be on such officer’s personal staff’ and employees “on the policymaking level” or serving the official as “an immediate adviser with respect to the exercise of the constitutional or legal powers of the office.” 42 U.S.C. § 2000e(f) (1972). The legislative history shows an acute awareness in the Senate of the undesirability of sweeping such key persons under the general prohibitions of discrimination. See Gregory v. Ashcroft, 501 U.S. 452, 491-92, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991) (Blackmun, J., dissenting).
In 1991, the Equal Employment Opportunity Act of 1972 was amended by GERA, 42 U.S.C. §§ 2000e-16a et seq. GERA wiped out the existing exemption of members of an elected official’s personal staff, those serving the official on a policymaking level, and those serving as immediate advisers. GERA was enacted with no findings by Congress as to state practices of discrimination against employees at this level of government. Without such findings was GERA a proportionate response to an identified evil? If not, GERA failed to meet the criteria set by the Supreme Court. See City of Boerne v. Flores, 521 U.S. 507, 520, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997).
The EEOC argues that the necessary findings had already been made in the hearings that preceded enactment of the Equal Employment Opportunity Act of 1972. The existence of widespread racial and sexual discrimination in state governments had been shown; the policymakers were not distinguished as different. If the findings were strong enough to sustain the Equal Employment Opportunity Act of 1972, they are, says the EEOC, strong enough to sustain GERA.
Does this piggyback work? The Governor’s Office denies that it does. One substantial difficulty is that separate provisions of the same act may have different effects on Eleventh Amendment immunity. Compare Tennessee v. Lane, 541 U.S. 509, 124 S.Ct. 1978, 158 L.Ed.2d 820 (2004) (holding that Title II of the Americans with Disabilities Act (ADA) validly abrogated state immunity as to cases involving the right of access to the courts) with Bd. of Trs. of the Univ. of Alabama v. Garrett, 531 U.S. 356, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001) (holding that Title I of the ADA did not validly abrogate state immunity as to the disabled alleging employment discrimination on account of their disability); see also Garrett, 531 U.S. at 360 n. 1, 121 S.Ct. 955 (“We are not disposed to decide the constitutional issue whether Title II [of the ADA], which has somewhat different remedial provisions from Title I [of the ADA], is appropriate legislation under § 5 *480 of the Fourteenth Amendment ... ”). What matters is the effect on Eleventh Amendment immunity that a particular provision has, not whether it amends or is part of another piece of legislation.
The Supreme Court has held that the Family and Medical Leave Act (FMLA) validly abrogated Eleventh Amendment immunity in part because, “of particular importance to the States, the FMLA expressly excludes from coverage state elected officials, their staffs, and appointed policymakers.” Nevada Dep’t of Human Res. v. Hibbs, 538 U.S. 721, 739, 123 S.Ct. 1972, 155 L.Ed.2d 953 (2003). Hibbs suggests that GERA’s expansion of the class of covered employees changes the Eleventh Amendment analysis.
In the course of holding that the Age Discrimination in Employment Act did not disturb the immunity of Missouri’s age limitation on judicial office, the Supreme Court observed:
“It is obviously essential to the independence of the States, and to their peace and tranquility, that their power to prescribe the qualifications of their own officers ... should be exclusive, and free from external interference, except so far as plainly provided by the Constitution of the United States.” Taylor v. Beckham, 178 U.S. 548, 570-571, 20 S.Ct. 890, 44 L.Ed. 1187 (1900). See also Boyd v. Nebraska ex rel. Thayer, 143 U.S. 135, 161, 12 S.Ct. 375, 36 L.Ed. 103 (1892) (“Each State has the power to prescribe the qualifications of its officers and the manner in which they shall be chosen”).
Gregory, 501 U.S. at 460, 111 S.Ct. 2395.
In 1972, Congress thought of state policymakers as different from other state employees, and so Congress specifically excluded them from coverage. The exclusion is at least an indication that the hearings did not establish an existing evil in the selection and retention of a governor’s close associates. Nothing in the record shows that a pattern of gender discrimination as to a governor’s staff, advisers, and policymakers existed in 1991 when GERA was enacted. The absence of such evidence is critical. Very few modern governors, it may fairly be assumed unless the contrary were shown, would intentionally discriminate on the basis of gender or race in choosing key advisers, and very few modern governors who did discriminate would be likely to keep their office. It would be guesswork, unsupported by the record, to suppose that a widespread pattern of intentional discrimination on account of gender or race existed among the fifty governors of the states as they selected staff assisting them in the exercise of their office.
No modern governor could run his government without the assistance of the sort provided in Alaska by the Director of the Governor’s Office in Anchorage and by the Special Staff Assistants. Being a governor is not a one-person job. The governor acts by his policymaking assistants. To treat these assistants as subject to federal legislation is tantamount to holding that the highest elected official in a state is bound by GERA. We do not believe that GERA is a proportionate response to a widespread evil identified as the predicate of this legislation. Accordingly, we grant the Governor’s Office’s appeal and remand to the EEOC with directions to dismiss the suit.
Remanded to the EEOC with directions to dismiss the suit.